RENDERED: AUGUST 24, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

### 2015-SC-000107-DG

INDIANA INSURANCE COMPANY                                                APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                                CASE NO. 2013-CA-000338-MR
CAMPBELL CIRCUIT COURT NO. 09-CI-01175

JAMES DEMETRE                                                             APPELLEE

## OPINION OF THE COURT BY JUSTICE HUGHES

## AFFIRMING

Appellee James Demetre sued his insurer, the Indiana Insurance

Company (hereafter "Indiana Insurance"), for bad faith arising from breach of

his insurance contract, violation of the Kentucky Unfair Claims Settlement

Practices Act, and violation of the Kentucky Consumer Protection Act. These

claims stemmed from a vacant property owned by Demetre that had operated

decades earlier as a gas station. When Demetre received notice that a family

occupying a nearby residence was pursuing environmental claims against him

for alleged migration of petroleum and other substances, he notified his liability

carrier, Indiana Insurance, which provided a defense and eventually settled the

family's claims. Indiana Insurance maintains that, having provided a defense

and indemnification, Demetre has no viable bad faith claim but the trial court

and the jury viewed the evidence of what occurred in the more than three years from notice of the family's claims to settlement of their lawsuit in an altogether different light. After an eight-day trial, the jury awarded Demetre $925,000 in emotional distress damages and $2,500,000 in punitive damages. The trial court denied post-trial motions and Indiana Insurance appealed to the Court of Appeals, which rejected Indiana Insurance's allegations of error and affirmed the trial court's judgment in its entirety.

On discretionary review, Indiana Insurance makes the following allegations of error:. 1) the trial court erred in not granting its motions for directed verdict and judgment notwithstanding the verdict; 2) there was insufficient evidence of Demetre's emotional distress to sustain the jury's award of damages; and 3) the trial court erred by barring two of Indiana Insurance's witnesses from testifying at trial and by erroneously instructing the jury. The second issue requires us to consider whether expert testimony is necessary to support an emotional distress damage award in a bad faith insurance claim, a potential application (or more accurately extension) of our relatively recent decision in *Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012). After careful consideration of the record and law, we affirm the Court of Appeals and thus affirm the trial court's judgment upon jury verdict.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2006, Demetre contracted with Indiana Insurance to provide coverage for his condominium residence and automobile. At the same time, Demetre obtained an excess liability or "umbrella" policy to provide him with additional

2

coverage. These bundled policies provided Demetre with approximately $2,500,000 in liability coverage. Demetre expanded his coverage in 2008 by adding liability coverage for two parcels of real estate, one in Kenton County and the other in Campbell County. Indiana Insurance's coverage of the Campbell County property was the genesis of the case at bar.

Until 1962, the Campbell County property was the site of an active Texaco gas station. The station remained dormant until the 1990s, when efforts were made to remove the station and its fixtures from the property. In 1998, the station's underground gasoline storage tanks were removed and, the next year, the station's building was torn down and all remaining materials were hauled away. As such, when Demetre acquired the Campbell County property from his in-laws in 2000, the property had been reduced to an empty lot. Despite the removal of the gas station and tanks, the Commonwealth of Kentucky's Department for Environmental Protection continued monitoring of the property for some time.

In April 2008, Demetre contacted Indiana Insurance to obtain coverage for the Campbell County property. Demetre informed Gwendolyn Rich, an Indiana Insurance agent, that the lot had previously been the site of a gas station. When later deposed, Rich confirmed that she had informed Indiana Insurance's underwriting department of the lot's prior use as a gas station. Indiana Insurance agreed to insure the Campbell County property and added it to Demetre's liability coverage in April. At this time, a major misstep occurred internally at Indiana Insurance because although the property was insured it

3

was apparently underwritten as though it was residential property.[1]  Shortly thereafter, on June 29, 2008, renewed Demetre's insurance policy for another year.

On September 4, 2008, Demetre received a letter from an attorney representing Mahannare Harris, her partner Dorian Cosby, and Harris's five minor children (collectively, the "Harris family").  The Harris family had moved into a house on a lot adjoining the Campbell County property in 2004.  In the letter, Paul Dickman, the lawyer for the Harris family, alleged that members of the family had suffered injuries due to gasoline emissions from the Campbell County property including "significant medical damages" and a loss in the fair market value of their residence.  Demetre immediately notified his agent of the letter and, on September 11, 2008, the agent notified Indiana Insurance of the Harris family's claims.

Indiana Insurance initially assigned Demetre's case to adjuster Allen Geisinger.  On September 17, 2008, Geisinger sent an "alert" to Indiana Insurance's Special Claims Unit, which handled environmental claims and toxic torts.  Eighty-eight minutes later, Geisinger received a response from David Cowles of the Special Claims Unit, instructing him to work with adjuster Paula Matheny and stating that "[i]t appears their (sic) may not be coverage under the Insured's condo policy for this matter."

---

[1] There is no suggestion that Demetre misrepresented the Campbell County property as a personal residence.  See pp. 13-14 *infra*.

4

On October 30, 2008, Geisinger sent Demetre a letter by certified mail informing him that Indiana Insurance had questions as to whether the Harris family's claims were covered by his insurance policy and would "handle this matter under a reservation of rights." This letter was sent approximately two weeks after Geisinger acknowledged in an email to a co-worker that he was unsure whether there would be coverage for the Harris family's claims, while at the same time admitting "I don't know what claims are being made against the insured by the attorney."

Subsequently, Geisinger directed Indiana Insurance's Field Investigation Unit to interview Demetre and to conduct an investigation of the Campbell County property. This investigation included obtaining from Shield Environmental Associates—the contractor monitoring groundwater underneath the Campbell County property for the Commonwealth—all environmental records, information, data, and testing documents related to the Commonwealth's monitoring of the property. These efforts were directed to determining whether Demetre knew of the Harris family's claims *before* the Campbell County property was added to Demetre's insurance policy.

While Geisinger thoroughly investigated Demetre, his investigation of the Harris family's claims was practically non-existent. When asked what he had done to assist Demetre, Geisinger explained that he "undertook this investigation, responded to Mr. Dickman's letters, hired or assigned a Field Investigation Unit to do sitework." Geisinger acknowledged that while he had spoken to Dickman early in the case, the attorney knew very little about his

5

clients or their alleged injuries. When asked about following up on the Harris family's claims, Geisinger explained that he was waiting for the Harris family's attorney to respond to him. There was no effort to interview the Harris family members, request medical records, seek medical exams, inspect or sample the soil near the Harris residence or otherwise determine the validity and nature of the claims being asserted against Demetre.

Despite this inaction, Geisinger wrote a letter to Demetre on March 23, 2009 (more than six months after Indiana Insurance had received notice of the Harris family's claims), where he stated "[p]lease recall that we are investigating the claims being made by Ms. Harris and her family. Their attorney has not provided us with any information regarding those claims." Geisinger then proceeded to ask questions about the status of the storage tanks from the Campbell County property. In closing his letter, Geisinger reminded Demetre that "[Indiana Insurance] continues to handle this matter under a reservation of rights."[2]

On March 27, 2009, Demetre's case was reassigned from Geisinger to Karen Shields Glardon.[3] Despite the change in personnel, Indiana Insurance was consistent in its lack of progress in assessing the Harris family's claims. When questioned during the subsequent litigation, Glardon admitted to doing

---

[2] On March 23, 2009, shortly before he was to leave the case, Geisinger acknowledged in an email "I have not determined a coverage position [as to the Harris claims]. I will need to obtain a coverage opinion from Claims Legal." When questioned, Geisinger testified that he never requested or obtained a coverage opinion.

[3] In this same month, the Harris family demanded alternative living arrangements to be paid for by Indiana Insurance. The insurer declined.

nothing to protect Demetre's interests during her handling of the case file. She did not seek information about the Harris family or their claims nor did she recall ever speaking with Demetre or Dickman.[4]

Despite Glardon's inaction, two significant developments occurred during her handling of the case. On June 29, 2009, Indiana Insurance renewed Demetre's insurance policy for another year. The second and more critical development came to pass on August 14, 2009, when the Harris family filed suit alleging trespass, nuisance and negligence claims against Demetre, and a third-party bad faith claim against Indiana Insurance. After consulting with the Special Claims Unit, Glardon engaged Tim Schenkel to represent Demetre and Don Lane to represent Indiana Insurance.[5] Although Glardon engaged Schenkel to represent Demetre, she admitted that she never spoke to him during her management of the case.

On September 25, 2009, Demetre's case was reassigned yet again to James Magi. Magi had significant experience handling toxic tort claims, to such an extent that he was considered the "go-to-guy" in the Special Claims Unit for this type of work. This reputation was likely in part derived from his success in closing 72% of his assigned insurance claims without paying any money to claimants. Further, on those cases where payment was made, 31%

_____

[4] Glardon did acknowledge sending an email inquiring about the existence of a coverage opinion.

[5] In August 2009, Demetre hired his own personal counsel to protect his interests given Indiana Insurance's seemingly adversarial position.

of them took an average of ten years to process (from the date a claim was made until the claim was closed and payment made). Magi was assigned Demetre's coverage claim and was also designated by Indiana Insurance to simultaneously handle the Harris family's liability claims.

Bruce Frederick, the unit leader of the Special Claims Unit and Magi's supervisor, explained that in Magi's role as insurance adjuster, he controlled and directed the activities of the attorneys involved in the case—Lane who represented Indiana Insurance and Schenkel who represented Demetre. As such Lane and Schenkel had to request permission from Magi to take necessary actions in representing their clients. To further demonstrate this, Magi testified that it was correct that, "[s]teps taken in litigation, whether to file a motion for summary judgment, whether to file a motion to bifurcate something, or take any other significant step in the conduct of litigation," had to be suggested by counsel to him, discussed with him, and approved by him, prior to the lawyer being permitted to take action.

In October 2009, Schenkel and Magi discussed hiring an expert to "determine the status" of the Campbell County property with the state environmental agency. With Magi's permission, Schenkel asked his associate Jason Morgan to find an expert to check the state regulatory records. On October 21, 2009, Morgan informed Schenkel that he had spoken to Bill Johnson, an environmental engineer in Louisville, who informed Morgan that the Campbell County property was "in Site Investigation NOT Corrective Action." In a memorandum to Schenkel, Morgan explained that "it seems to

8

me that if the site is in Site Investigation and not Corrective Action, it is unlikely that the [Harris family]'s claims are legitimate."

On November 4, 2009, Magi noted in an internal data management system that he "[s]poke to D/C, he is in the process of retaining an expert from Louisville. He will send me the CV and rates." Given the context of the diary and the date of the entry, it would appear that this message was referring to Schenkel, in his role as defense counsel, and Johnson, as the expert from Louisville. Additionally, in copies of email messages between Schenkel and Magi that were admitted as evidence in trial, Schenkel reiterates that Magi should "be assured that I will keep you informed of all future developments in this matter." Yet, in his trial testimony Magi denied having any knowledge of Morgan's memorandum about the questionable nature of the Harris family's claims.

Magi seemingly focused his full attention on attempting to deny coverage. On December 11, 2009, Magi sent a second Reservation of Rights letter to Demetre, in which he noted that defense counsel had been provided to Demetre and "Indiana [Insurance] shall continue such defense until a determination is made that no coverage exists for the [u]nderlying [c]laim. . . ." Thus fifteen months after Demetre notified Indiana Insurance of the Harris family's claims, there was still no determination as to coverage.

Shortly after Magi sent this letter to Demetre, Indiana Insurance internally separated the Harris family's claims file, the bad faith file, and the coverage file. William Ambrose was assigned to handle the Harris family's

claims, while Magi retained control over the coverage and bad faith files. Despite the split in management of the files, Schenkel continued to update Magi about any developments he learned of in the handling of the Harris family's claims.

On January 22, 2010, Indiana Insurance answered the Harris family's amended complaint and filed a declaratory judgment cross-claim, under Kentucky Revised Statutes (KRS) 418.045, against its insured, Demetre. Indiana Insurance claimed that while Demetre contacted Indiana Insurance's agent to insure the Campbell County property, "the parties have been unable to identify an actual endorsement that was appended to the [p]olicy adding coverage for the [p]roperty to it." Second, Indiana Insurance alleged that '[a]t the time that Demetre sought to insure the [p]roperty, he was aware that investigations concerning possible contamination of the [p]roperty had been ongoing for several years and failed to inform the [a]gent or Indiana [Insurance] of contamination on the [p]roperty before seeking to insure it."

On May 4, 2010, Demetre filed an answer to Indiana Insurance's cross-claim and raised his own cross-claims alleging bad faith breach of contract, unfair claims settlement practices and violations of the Kentucky Consumer Protection Act. Demetre asserted that Indiana Insurance had wrongly asserted a reservation of rights, and he requested a declaration of his rights and duties under the liability policy.

On September 23, 2010, Indiana Insurance filed a motion for a declaratory judgment seeking a summary ruling that it had no duty to defend

10

or indemnify Demetre for the Harris family's claims under any insurance policies issued to Demetre by Indiana Insurance. Indiana Insurance argued that "[j]udgment is appropriate because the Harris claim results from a loss in progress under the relevant insurance coverage, and therefore, this 'loss' cannot be covered as a matter of law." The loss-in-progress doctrine relieves the insurer of a coverage obligation where the insured was aware of an ongoing progressive loss at the time the policy became effective. While the loss-in-progress doctrine has never been recognized by this Court or the Kentucky Court of Appeals, Indiana Insurance relied on a decision from the United States District Court for the Western District of Kentucky. *See Pizza Magia Int'l, LLC v. Assurance Co. of America*, 447 F. Supp. 2d 766, 776 (W.D. Ky. 2006). That Court opined that the Kentucky Supreme Court would adopt the loss-in-progress doctrine.[6]

On December 8, 2010, the trial court, after reviewing Indiana Insurance and Demetre's detailed pleadings, denied Indiana Insurance's motion for a

---

[6] In support of the declaratory judgment motion, Indiana Insurance included an affidavit from Deborah Chikar, a senior underwriter with the Liberty Mutual Group, of which Indiana Insurance is a member company. She claimed that the insurer added the Campbell County property to Demetre's policy believing it was another residence occupied by the insured; that it was unaware that it was a "contaminated former gasoline station;" and that had it known the true status of the property it would never have insured it. This affidavit also provides some insight as to why Demetre's insurance policy was repeatedly renewed during this litigation. Chikar claimed that in September 2008, Indiana Insurance sought to discontinue its coverage. However, she claimed that Indiana Insurance could not cancel the coverage midterm for the 2008-2009 policy period. Second, she alleged that Dawn Dunham, a former employee of Liberty Mutual, had intended to send Demetre a notice cancelling the policy before its 2009-2010 renewal, but through clerical oversight failed to do so. Third, Chikar admitted that when it was time to renew the policy for 2010-2011, that she "was unable to timely complete [her own] due diligence" and as such renewed the policy for another year.

11

declaratory judgment. The trial court determined that a declaratory judgment would not be appropriate as "Indiana [Insurance] is essentially asking the [trial court] to adopt factual defenses in order to grant judgment in their favor." After noting that there was no controversy regarding whether the policy would cover the type of third-party loss that was the subject of the underlying *Harris* litigation or that Indiana Insurance had a duty to defend, the trial court explained:

> Indiana [Insurance] is asking this Court to declare that its *public policy based defense* under the known loss rule or loss in progress doctrine excludes them from having to indemnify Demetre should [the Harris family] succeed at trial. However, there is a controversy between Demetre and Indiana [Insurance] regarding whether Demetre knew of the loss at the time he sought coverage. Nonetheless, this is a fact-based question which goes directly to the proof of Indiana [Insurance]'s defense that cannot be disposed of through a declaratory judgment. The question is best reserved for the trier of fact and not appropriate for judicial determination as a matter of law unless the Known Loss Rule or the Loss in Progress Doctrine applies to the present case.

(emphasis in original).

Additionally, the trial court acknowledged the cited federal authority but concluded, "the Courts of the Commonwealth have [had] the opportunity to adopt the known loss rule and have not exercised that authority. Instead, the Kentucky appellate courts have recognized the fortuity doctrine." The trial court refused to recognize the known loss rule or the loss-in-progress doctrine and further noted that "even if [it] were to adopt the rule, Indiana [Insurance] has not provided sufficient facts to warrant summary judgment in its favor as a

12

matter of law under the known loss rule or the loss in progress doctrine or even the fortuity doctrine."[7]

On January 21, 2011, Demetre moved to discharge Schenkel as counsel.[8] Demetre sought an order "declaring that the lack of measureable progress by the attorney assigned to defend him in the tort action over the past 17 months and the conflict of interests between Indiana [Insurance] and Demetre in the tort action over-rides Demetre's duty to cooperate with Indiana [Insurance] found in his homeowner's policy." Accordingly, Demetre sought the discharge of the law firm assigned by Indiana Insurance and to proceed with independent counsel.

After Demetre's motion was filed, Indiana Insurance elected to abandon all insurance policy defenses, with the exception of the "time-on-loss" defense. In a February 10, 2011 response opposing Demetre's motion regarding counsel and seeking declaratory judgment in his favor regarding the coverage issue, Indiana Insurance stated that *"[a]fter investigation, Indiana [Insurance] waived [insurance policy defenses] because the investigation revealed that they may not apply,* and Indiana chose to resolve all doubts in favor of James Demetre."[9]

---

[7] In the same order, the trial court expressed its displeasure with the failure of the parties to engage in discovery on the bad faith issue: "there has been no discovery on this issue despite this Court's order several months ago that the parties engage in discovery on all claims. The Court admonishes the parties to *immediately* commence discovery on the bad faith claim against Indiana (emphasis in original)."

[8] At trial, Demetre testified that he had met with Schenkel only on one occasion, during which they discussed his case for approximately fifteen minutes.

[9] Indiana Insurance apparently informed the trial court of its intent to waive its policy defenses at a January 28, 2011 hearing. When Indiana Insurance waived all

13

(Emphasis supplied). While the August 2010 Chikar affidavit supporting Indiana Insurance's motion for declaratory judgment had alleged that Demetre misled the insurer about the Campbell County property and its former use, in this response Indiana Insurance acknowledged it did not believe Demetre had ever intentionally obtained coverage on a false basis. The remaining insurance policy defense, "time-on-loss," was described by Indiana Insurance as "whether the [Harris family's] injuries, if any, occurred during the policy period, as opposed to occurring during a period in which Demetre chose not to insure the property."[10]

On March 7, 2011, while Demetre's motion for a declaratory judgment was still pending, Schenkel filed a motion requesting leave to withdraw as counsel. Schenkel explained that Demetre, "alleges that a conflict of interest has developed between and among the undersigned and himself which precludes further representation in this matter." The trial court granted Schenkel's motion to withdraw on March 22, 2011. Also, on the same day Schenkel moved to withdraw as counsel, three attorneys from Frost Brown Todd entered their appearance as Indiana Insurance's appointed counsel for Demetre.

---

defenses to coverage with the exception of time-on-loss, it informed the trial court that it also "was voluntarily waiving its right of appeal on the 'loss in progress' issue."

[10] On June 29, 2011, Indiana Insurance in its answer to the Harris family's second amended complaint, formally adopted the time-on-loss defense in its cross-claim against Demetre. The time-on-loss defense was also maintained in Indiana Insurance's November 7, 2011 answer to the Harris family's third amended complaint. Under the time-on-loss theory, Indiana Insurance argued that Demetre would be liable for fifty percent of any personal injuries and two-thirds of any property damages awarded to the Harris family.

14

On September 28, 2011, more than three years after Indiana Insurance was first notified of the Harris family's claims and over two years after the family filed suit against Demetre, Mahannare Harris was finally deposed. All depositions which concerned the Harris family's claims were completed on December 19, 2011. In addition to the depositions, medical records of the Harris family were obtained, independent medical exams on the adult plaintiffs were conducted, and inspections of the Harris residence were performed. Based on this investigation (which took less than ninety days), Philip J. Schworer, an attorney with Frost Brown Todd, concluded in his December 16, 2011 pre-mediation statement for Demetre that the *Harris* case "is a *nuisance value case.*" The attorney concluded there was no evidence that the Harris family had suffered or would suffer harm from any substances associated with the Campbell County property. Schworer's conclusion about the merits of the Harris family's claims was similar to that reached by Morgan two years earlier in his October 2009 memorandum where he stated that, based on his consultation with an environmental engineer about the Campbell County property, "it is unlikely that the [Harris family]'s claims are legitimate." On January 23, 2012, Indiana Insurance elected to settle the Harris family's case for $165,000.[11]

With the resolution of the Harris family's claims, Demetre moved on February 7, 2012, to dismiss Indiana Insurance's cross-claim against him and

---

[11] The Harris family's earlier settlement demands had been for $10,000,000 and $3,000,000.

15

that cross-claim was dismissed with prejudice on February 17, 2012. By that point, Demetre had spent a significant amount of his own money litigating with Indiana Insurance. The sum total of Demetre's personal legal fees and expenses from August 27, 2009, to February 17, 2012, was approximately $397,541.04. However, the dismissal of Indiana Insurance's cross-claim against Demetre was not the end of the case, as Demetre continued to litigate his claims against Indiana Insurance.

On April 13, 2012, Indiana Insurance requested summary judgment on Demetre's bad faith claim, stating that it had "fully defend[ed] and indemnif[ied] [Demetre]," which included taking "reasonable and necessary steps to protect Mr. Demetre." Further, Indiana Insurance argued that Demetre was unable to prove that it acted in bad faith or breached a contractual obligation, "because he cannot show that Indiana [Insurance] failed to pay the claim; cannot deny that he has failed to prove any damages related to the improper manner in which he *alleges* that Indiana [Insurance] handled the claim; and cannot show that Indiana [Insurance] acted with malice or ill will toward him (emphasis in original)."

In denying Indiana Insurance's motion for summary judgment, the trial court noted that Indiana Insurance presented a legal argument, without specific evidentiary support, to establish that "the company did not act in bad faith and fulfilled all fiduciary duties owed Demetre." Further, the trial court interpreted Indiana Insurance's motion as a request 'to find as a matter of law that, because Indiana [Insurance] provided Demetre a defense and indemnity,

16

it fulfilled its obligations to Demetre.'" The trial court was unwilling to construe the Unfair Claims Settlement Practices Act ("the UCSPA") and Demetre's related causes of action so narrowly. Further, the trial court was persuaded that an insurer's unreasonable delay could be the basis of a claim under the UCSPA, if there was evidence to demonstrate that the delay was prompted to deceive the insured with respect to coverage or part of an attempt to extort a more favorable settlement.

In September 2012, the bad faith case went to trial. During Demetre's case-in-chief, he called Magi to testify. In his deposition prior to trial, Magi had claimed that there was a factual basis for Indiana Insurance to assert that Demetre knew about contamination on the Harris family's property prior to his obtaining insurance in April 2008. Specifically, Magi alleged the existence of a document, identifying soil vapors that existed on the Harris family's property and moreover that document was located in the claims file. After Magi was asked if that document had been provided to Demetre's counsel, Lane interjected saying "I'll just state for the record the entirety of the claim file has been produced." During that deposition, Demetre's counsel and Magi had the following exchange:

> Q - So, If I look at the claims file that's been produced by Indiana Insurance Company in this case, I'm going to find proof of soil contamination on Mrs. Harris's property prior to April 30th, 2008; correct?
> A -- Correct.
> Q -- That's the position of Indiana Insurance Company; correct?
> A -- Correct.
> Q -- I'm going to find a document confirming or verifying or identifying groundwater contamination underneath Mrs. Harris's

17

house or Mrs. Harris's property prior to April 30th, 2008, in the file correct?

A – Correct.

Q – That's the position of Indiana Insurance Company; correct?

A – Correct.

Q – I'm going to find in the file documentation identifying soil vapors on her property, on Mrs. Harris's property, existing prior to April 30th, 2008, in the file; correct?

A – Correct.

Q – And, again, that's the position of Indiana Insurance Company; correct?

A – Correct.

Q – And that is the factual basis for the allegation that this is a known loss; correct?

A – Correct.

When questioned at trial, Magi explained that three letters—and only those letters—constituted the basis for Indiana Insurance's position that Demetre knew prior to insuring his property about underground contamination on the Harris family's property. The first letter was sent to Demetre on March 28, 2007, from the Kentucky Department for Environmental Protection, Division of Waste Management's Underground Storage Tank Branch. The letter explained that review of information submitted in December 2004 by Shield Environmental Associates concerning the Campbell County property "indicate[s] the presence of BTEX constituents above allowable levels in the following areas: Entire Konens Site and possibly off-site to the East and West. This indicates the necessity for additional site investigation."[12] However, as later noted by the trial court, "[w]hat is noticeably absent from this notification is any indication of *actual* offsite migration or an indication of such and

_____

[12] The "Konens Site" referenced in the letter is the Campbell County property at issue in this case.

18

whether any migration was in an amount rising to unallowable levels (emphasis in original)." Additionally, Magi admitted that Indiana Insurance never asked Demetre about this letter.

The second letter relied upon by Magi, dated January 7, 2008, was from the Department for Environmental Protection to Mahannare Harris. In that letter, the Department requested permission for Shield Environmental Associates to access the Harris family's property. The Department was interested in determining the extent of contamination, if any, caused by the Campbell County property. The letter explained that "[i]f contamination above allowable levels, is confirmed on your property, Mr. Jim Demetre—will be required to perform corrective action, pursuant to 401 KAR 42:060, as necessary to remediate the contamination." The third letter, dated August 28, 2007, was from Shield Environmental Associates to Harris. This letter informed Harris that they would be investigating soil and groundwater conditions at the Campbell County property. Shield Environmental Associates requested access to the Harris family's property because to complete its "investigation, the drilling and sampling of soils and possibly groundwater on your property will be necessary." Demetre was not copied on either of these letters to Harris and there was no evidence he was aware of the letters before insuring the Campbell County property in April 2008.

When questioned at trial about Indiana Insurance's time-on-loss defense, Magi admitted that it was rooted in speculation and conjecture. Specifically, Magi had speculated that any injury to the Harris family had occurred between

19

2004 when the Harris family obtained their property and April 2008 when Demetre contracted with Indiana Insurance to insure the Campbell County property. However, Magi admitted that there was no evidence available to support this defense.

Demetre testified at trial and acknowledged that he was in very good physical health for a seventy-two-year-old man, but he explained at length that the dispute with Indiana Insurance had taken a heavy toll on his mental health. When asked by his counsel about what his last four years had been like, Demetre said:

> Oh my God, it has been a total disaster. It has been a nightmare. What I've been through in these past four years because of that insurance company over there. They didn't honor their contract. I think it's wrong. I made a deal with them and they took my money and they fought me. And they just fought me for four years. To this day I'm still fighting.

Demetre described the stress of being sued for millions of dollars by the Harris family and worrying about what would happen to him and his wife if the Harris family succeeded on their claims and the insurance company refused to cover the damages. Demetre explained that he "[w]as scared to death. I was looking at all this money. Where was it going to come from? I didn't have that kind of coverage and I didn't have that kind of money and I'm looking at who knows what. I am looking at bankruptcy. I had no clue. Didn't know what was going to happen."

Demetre described to the jury the significant anxiety and worry he had experienced due to this case by saying, "[w]ell when you're about to lose whatever these figures come out, ten million, three million, it does cause a lot

20

of havoc. Past four years have been a total hell to me. Couldn't talk to my wife about it, just kept everything inside."[13] He revealed that it impacted all aspects of his life, including his marital life, his business relations, and his ability to sleep. While Demetre did not see a mental health professional for his stress, he sought spiritual comfort from his priest. Demetre labeled his treatment by Indiana Insurance a "persecution" that impacted his mental health dramatically for a considerable period of time. He also testified to the substantial financial and emotional stress caused by incurring almost $400,000 in attorney fees in order to secure the coverage he had purchased.

Demetre offered the expert testimony of Carl Grayson, who concluded that Indiana Insurance violated its common law and statutory duties of good faith and fair dealing, its fiduciary duties, and the Unfair Claims Settlement Practices Act. While Grayson acknowledged that Indiana Insurance could defend under a reservation of rights and that a declaratory judgment action is a proper means to resolve coverage issues, he was sharply critical of Indiana Insurance's conduct. Specifically, Grayson determined that Indiana Insurance: 1) misrepresented pertinent facts or insurance policy provisions relating to the coverage at issue; 2) failed to acknowledge and act reasonably promptly upon communications with respect to claims arising under the insurance policy; 3) failed to adopt and implement reasonable standards for the prompt

---

[13] Demetre's wife later learned of the litigation through a notice sent to their residence by the sheriffs' office. Demetre had not revealed the dispute to her, for three and one-half years, due to concerns for her failing health.

investigation of insurance claims; 4) refused to pay claims without having conducted a reasonable investigation based upon all available information; and 5) failed to affirm or deny coverage of claims within a reasonable time after receiving notice.

At the close of Demetre's case, Indiana Insurance moved for a directed verdict on all claims, contending that the evidence showed that they had provided Demetre a defense and indemnification. Further, Indiana Insurance argued that there was insufficient evidence of Demetre's alleged emotional distress. The motion was denied. Subsequently, Indiana Insurance called Peter Hildebrand, an expert witness, as its first and only witness. Hildebrand testified that Indiana Insurance did not deny Demetre coverage and that it conducted a reasonable investigation and defended Demetre from the Harris family's claims. Although Indiana Insurance had abandoned the defense, he explained the known loss rule in describing and defending the insurer's original position regarding the lack of coverage. He also opined that environmental claims are difficult to handle and that generally it takes two to four years to resolve claims involving leaky underground storage tanks. At the conclusion of Hildebrand's testimony, Indiana Insurance renewed its motion for directed verdict, which was again denied.

The case was submitted to the jury with instructions setting forth three causes of action: 1) violation of the Unfair Claims Settlement Practices Act; 2) violation of the Consumer Protection Act; and 3) breach of contract. The jury .

found for Demetre on all three theories and awarded him $925,000 in emotional distress damages and $2,500,000 in punitive damages.[14]

Shortly thereafter, Indiana Insurance filed a motion for judgment notwithstanding the verdict or for a new trial. While that motion was pending, Indiana Insurance alerted the trial court to this Court's recently rendered opinion in *Osborne v. Keeney* regarding expert testimony. After considering Indiana Insurance's arguments and pleadings, the trial court overruled the motion for judgment notwithstanding the verdict or for a new trial.[15] Indiana Insurance then appealed the trial court's judgment to the Court of Appeals, which, as noted above, affirmed the judgment in its entirety.

## ANALYSIS

### I. The Trial Court Properly Denied Indiana Insurance's Motions for Directed Verdict and Judgment Notwithstanding the Verdict.

Indiana Insurance argues that the trial court erred by not granting its motions for directed verdict and judgment notwithstanding the verdict. The standard of review of a trial court's denial of a motion for directed verdict is explained in detail in *Lewis v. Bledsoe Surface Mining Co.*, 798 S.W.2d 459 (Ky. 1990):

> Upon review of the evidence supporting a judgment entered upon a jury verdict, the role of an appellate court is limited to determining

---

[14] The jury instructions included a "not to exceed" number of $2.5 million for emotional distress and $10 million for punitive damages.

[15] Subsequently, Demetre sought an award of attorneys' fees in the amount of $1,006,991. The trial court denied the motion, except that in the event that the verdict under the Consumer Protection Act was affirmed but the overall verdict in favor of Demetre was reduced below the amount claimed by Demetre as fees, in that case Demetre would be adjudged entitled to an award of fees necessary to reach a total award of $1,006,991.

whether the trial court erred in failing to grant the motion for directed verdict. All evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence, these being functions reserved to the trier of fact.

*Id.* at 461 (citing *Kentucky & Indiana Terminal R. Co. v. Cantrell*, 184 S.W.2d 111 (Ky. 1944); *Cochran v. Downing*, 247 S.W.2d 228 (Ky. 1952)). Additionally, the nonmoving party "is entitled to all reasonable inferences which may be drawn from the evidence." *Lewis*, 798 S.W.2d at 461. The decision of the trial court will stand unless it is determined that "the verdict rendered is 'palpably or flagrantly' against the evidence so as 'to indicate that it was reached as a result of passion or prejudice.'" *Id.* at 461-62 (quoting *NCAA v. Hornung*, 754 S.W.2d 855, 860 (Ky. 1988)). Further, "the considerations governing a proper decision on a motion for judgment notwithstanding the verdict are exactly the same as those . . . on a motion for a directed verdict." *Cassinelli v. Begley*, 433 S.W.2d 651-52 (Ky. 1968).

Before turning to Indiana Insurance's specific arguments in support of a directed verdict or judgment notwithstanding the verdict, it is necessary to revisit briefly Kentucky law regarding bad faith. As this Court recognized in *Davidson v. American Freightways, Inc.*, 25 S.W.3d 94 (Ky. 2000), bad faith claims against an insurer can be premised on common law as developed in cases such as *Manchester Ins. & Indem. Co. v. Grundy*, 531 S.W.2d 493 (Ky. 1975) (bad faith claim premised on insurer's refusal to settle a third-party liability claim, resulting in a verdict in excess of policy limits) and *Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176 (Ky. 1989) (bad faith claim for failure

24

to settle claim made by insured under his own policy). Common law bad faith claims flow from the insurer's breach of the covenant of good faith and fair dealing.

A bad faith claim can also be based on either or both of two Kentucky statutes: the Kentucky Consumer Protection Act, KRS 367.170, and the UCSPA, KRS 304.12-230. See *Davidson*, 25 S.W.3d at 96-100. The Consumer Protection Act prohibits "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or business" and grants a right of recovery to persons who have purchased or leased goods or services for personal, family or household purposes and in conjunction therewith have been injured by a prohibited act or practice. KRS 367.170; KRS 367.220. *See, e.g., Stevens v. Motorists Mut. Ins. Co.,* 759 S.W.2d 819 (Ky. 1988) (homeowner's policy was purchase of "service" and homeowner had Consumer Protection Act claim where insurer intentionally misrepresented experts' report and arbitrarily refused to negotiate blasting damage claim).

The UCSPA prohibits a number of different "acts or omissions" including, but not limited to, misrepresenting pertinent facts or policy provisions relating to coverage; failing to promptly acknowledge and respond to claims; failing to adopt and implement standards for prompt investigation of claims; refusing to pay claims without first conducting a reasonable investigation; failing to affirm or deny coverage within a reasonable period of time; and not attempting in good faith to reach a prompt, fair and equitable settlement of claims on which liability is reasonably clear. KRS 304.12-230. "The gravamen of the UCSPA is

25

that an insurance company is required to deal in good faith with a claimant, whether an insured or a third-party, with respect to a claim which the insurance company is contractually obligated to pay." *Davidson*, 25 S.W.3d at 100. Although the UCSPA does not include a private right of action provision, KRS 446.070 allows a person injured by a violation of any Kentucky statute to recover damages from the offender. Thus, "KRS 446.070 and KRS 304.12-230 read together create a statutory bad faith cause of action." *State Farm Mut. Auto Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988).

As the *Davidson* court noted, Justice Leibson, writing for a unanimous court in *Wittmer v. Jones*, 864 S.W.2d 885 (Ky. 1993), "gathered all of the bad faith liability theories under one roof and established a test applicable to all bad faith actions," whether first-party or third-party claims and whether based on common law or statute. 25 S.W.3d at 100. The three required elements are:

> (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Id.* quoting *Wittmer*, 864 S.W.2d at 890.

Indiana Insurance argues, rather half-heartedly, that the *Wittmer* elements do not actually apply to this case because Demetre is neither a first-party claimant seeking to recover personally on his own policy nor a third-party claimant seeking recovery from a tortfeasor's liability policy. While this is true,

26

we reject the insurer's proposition that Demetre is not a claimant at all. The essence of liability insurance is that the insured is indemnified in the event of a third-party claim and, if necessary, has counsel to represent his or her interest in litigation. A liability insured who seeks these benefits owed under a policy of insurance is most assuredly making his or her own claim. As this Court noted in *Knotts v. Zurich Ins. Co.,* 197 S.W.3d 512, 516 (Ky. 2006), "'claim' is subject to multiple, subtly different definitions. . . . But at its most basic, the word means an assertion of a right, with the contours and specific nature of the right depending on context."[16] When Demetre notified Indiana Insurance of the Harris family's claims in September 2008, he himself made a "claim" for the benefits he had purchased under the liability policy.[17] With this overview of bad faith claims in mind, we turn to Indiana Insurance's argument that it was entitled to judgment as a matter of law.

---

[16] *Knotts* also quotes the following Black's Law Dictionary of the word "claim:"

> 1. The aggregate of operative facts giving rise to a right enforceable by a court <the plaintiff's short, plain statement about the crash established the claim>.—Also termed *claim for relief.* 2. The assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional <the spouse's claim to half the lottery winnings>. 3. A demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for.... 4. An interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing; CAUSE OF ACTION (1) <claim against the employer for wrongful termination>.").

[17] The jury instructions in this case appropriately defined "claim" as "The assertion of a right or a demand for something that is believed to be rightfully due under an insurance policy."

## A. Demetre's UCSPA and Breach of Contract Claims.

Indiana Insurance repeatedly emphasizes that it provided Demetre with defense counsel and indemnified him by settling the Harris family's claims. Given that these two primary obligations under the liability insurance policy were met, Indiana Insurance perceives that Demetre's bad faith claim is solely (and improperly) premised on the fact that Indiana Insurance raised a coverage issue and filed a declaratory judgment claim, actions it was legally entitled to take. As the trial court found, Indiana Insurance's view of the scope of common law and statutory bad faith is too narrow. Further, the insurer overlooks (or fails to acknowledge) that Demetre's bad faith allegations were about more than the fact that the insurer sought a judicial determination regarding coverage. Nevertheless, we begin our review with *Guaranty Nat'l Ins. Co. v. George*, 953 S.W.2d 946 (Ky. 1997), the case Indiana Insurance principally relies on to argue that it was entitled as a matter of law to question coverage and seek a judicial determination, and thus the trial court was obligated to grant its motion for directed verdict.

In *George*, the George family contracted with Guaranty National to provide commercial insurance coverage for a truck used for mail service but the wrong vehicle was mistakenly listed on the policy. *Id.* at 947. After the mail truck was involved in a fatal accident, the Georges were sued for wrongful death. *Id.* Guaranty National provided them with counsel, but reserved the right to deny coverage, should the facts indicate the insurance policy did not cover the vehicle involved in the accident. *Id.* In response, the Georges filed an

action alleging bad faith on the part of Guaranty National. *Id.* Ultimately the circuit court concluded that there had been a mutual mistake, and ordered equitable reformation of the insurance contract, resulting in the insurer settling the wrongful death case. *Id.* at 948. In granting Guaranty National summary judgment on the Georges' bad faith claims, the circuit court concluded that the "legal questions of reformation and agency raised by Guaranty National in filing the declaration of rights action were 'fairly debatable.'" *Id.* (quoting *Empire Fire & Marine v. Simpsonville Wrecker*, 880 S.W.2d 886 (Ky. App. 1994)). Additionally, the circuit court opined that "[i]t should not be left to a jury to determine whether the legal principles involved are 'fairly debatable.'" *Id.*

Although the Court of Appeals held that the Georges were entitled to pursue a bad faith action, this Court, citing the *Wittmer* elements, concluded otherwise, siding with the trial court. *Id.* In *George*, the Supreme Court held that an insurer is expressly "entitled to challenge a claim and litigate it if the claim is debatable on the law or the facts." *Id.* at 949. This Court found that the insurer's conduct did not rise to the level necessary to sustain a bad faith action in large part because "Guaranty National provided a defense for the Georges and the claim proceeded without delay." *Id.*

Significantly, the *George* Court expressly rejected the position Indiana Insurance now advocates, *i.e.,* that defending the insured under a reservation of rights and seeking declaratory judgment on coverage precludes a bad faith claim.

29

> Some may argue that the insurer, by notifying its insured that it is defending under a reservation of rights and filing a declaratory action, is automatically absolved of bad faith. *We do not so hold.* Clearly, one can envision factual situations where an insurer could abuse its legal prerogative in requesting a court to determine coverage issues. Those may well be addressed through a motion under [Kentucky Rule of Civil Procedure (CR)] 11 or, in certain circumstances, an action for bad faith.

*Id.* (emphasis supplied).

Indiana Insurance insists that, as in *George,* the trial court should have concluded that their conduct did not meet the "bad faith threshold," and points to several similarities between *George* and the case at bar. In particular, both cases involve: 1) a suit against an insured; 2) an insurer defending under a reservation of rights; 3) the assertion of a bad faith claim; 4) a judgment that coverage exists; and 5) the insurer settling the underlying claim within the policy's limits. Despite these similarities, *George* is readily distinguishable from this case.

In *George,* the circuit court found that there had been "a mutual mistake" that required equitable reformation of the insurance contract. The mutual mistake was due to Guaranty National's erroneously listing the wrong vehicle in preparing the policy and the Georges not subsequently identifying this prominent error in the policy. The case at bar was manifestly not about a "mutual mistake" in the underlying insurance contract but rather a coverage dispute premised on the insured allegedly having misled the insurer at the time the policy was purchased and the insurer's expectation that Kentucky courts would recognize the loss-in-progress doctrine.

30

It was uncontested that when Demetre sought coverage for the Campbell County property in April 2008 he informed Indiana Insurance's agents that the property had previously been the site of a gas station. Accepting the potential risk inherent in insuring such a property, Indiana received Demetre's premium payments and provided coverage.[18] In September 2008, when Demetre informed Indiana Insurance about the Harris family's claims, Indiana Insurance conducted an eighty-eight-minute review of the policy and determined that there was a potential coverage issue. Later, in October 2008, Indiana Insurance informed Demetre that they were proceeding with his claim under a reservation of rights. Indiana Insurance then began a detailed investigation of Demetre's property directed to determining what Demetre knew about the property's status when he purchased insurance in April 2008. Almost a year after Demetre had notified Indiana Insurance of the Harris family's claims, the family sued Demetre and Indiana Insurance. Shortly thereafter, in October 2009, the defense counsel assigned to Demetre by Indiana Insurance consulted an environmental engineer and determined that it was unlikely that the Harris family's claims were legitimate. However, the environmental engineer was not hired and nothing was done to advance Demetre's defense.

---

[18] As noted, there was apparently an internal error in classifying and underwriting the Campbell County property but that error on the part of Indiana Insurance was not chargeable to Demetre.

In January 2010, sixteen months after first being notified of the Harris family's claims, Indiana Insurance filed a declaratory action against Demetre, claiming that it was unable to identify "an actual endorsement that was appended to the policy adding coverage to it." Indiana Insurance advanced this argument despite having renewed the policy on June 29, 2009. The insurer also alleged that when Demetre insured the property, he "was aware that investigations concerning possible contamination of the [p]roperty had been ongoing for several years and failed to inform the [a]gent or Indiana [Insurance] of contamination on the [p]roperty before seeking to insure it." Far from the mutual mistake at issue in *George*, Indiana Insurance alleged that its insured had deliberately misled the company.

The only foundation for this serious allegation against its insured consisted of two letters to Mrs. Harris that Demetre had never seen and a March 2007 letter that Demetre had received from the Department for Environmental Protection. The latter identified likely contamination on the Campbell County property and "possibly off-site to the East and West," but indicated that further investigation should be conducted. Notably, after obtaining this letter to Demetre, Indiana Insurance never asked him for clarification about his understanding of this correspondence. In any event by the fall of 2009, Indiana Insurance no longer needed to rely on speculation about contamination of the Harris property and Demetre's knowledge of it because the insurer had performed its own investigation of the Campbell County property. Based on this information and defense counsel's

32

consultation with an environmental engineer, Indiana Insurance was aware that the Harris family's claims were likely "not legitimate."

Despite this knowledge, Indiana Insurance pursued a declaratory action against Demetre for a full year, finally abandoning in January 2011 its legal justifications for denying coverage. Even then, the insurer continued to rely on the "time-on-loss" doctrine to limit its liability. Ultimately, this last theory was shown to be meritless, with Magi testifying at trial that there was no evidence to support the time-on-loss defense—it was essentially speculation and conjecture.

Manifestly, this case was not about a "mutual mistake" as in *George*, but rather, viewing the evidence in the light most favorable to Demetre, a sustained effort on the part of Indiana Insurance to deny coverage long after it could and should have determined that it was legally obligated under its contract with Demetre. Similarly, there was a significant difference in how Guaranty National and Indiana Insurance defended the claims asserted against their respective insureds. In *George*, the Court noted that the insurer "provided a defense for the Georges and the claim proceeded without delay." 953 S.W.2d at 949. Indiana Insurance took a decidedly different approach.

In October 2008, Geisinger, the first adjuster assigned to Demetre's case, authorized a thorough investigation of Demetre's property, but did not inquire into the validity or nature of the Harris family's claims. Glardon, the second adjuster assigned to Demetre's case, did even less. The *Harris* suit was filed in August 2009 and Indiana Insurance engaged Schenkel to defend Demetre but

33

by January 2011, Demetre sought to discharge Schenkel noting, quite accurately, the lack of measurable progress in defense of the tort action over a seventeen-month period. Later, with newly appointed counsel, an investigation into the Harris family's claims began in earnest. In September 2011, Mahannare Harris was finally deposed and within weeks medical records were obtained and an inspection of the house was performed. By December 2011, Demetre's second appointed counsel concluded that the Harris family's claims were nothing more than a "nuisance value case." Despite this conclusion, Indiana Insurance settled the case with the Harris family for $165,000 in January 2012, three years and four months after first being apprised of the claim and over two years after the family's lawsuit was filed. Based on these facts it cannot be said that the resolution of the claim "proceeded without delay" as in *George.* Further, the evidence readily supports Demetre's contention that Indiana Insurance was far more interested in denying coverage than defending its insured against the Harris family's claims.

Finally, unlike in *George* where the coverage question was "fairly debatable," here the coverage question was straight forward; the Campbell County property was insured by Indiana Insurance and there was no credible evidence that Demetre was aware of the Harris family's claims and misled the company, a position the insurer finally abandoned in January 2012. Notably, the *George* Court expressly recognized that while the actions of Guaranty National in that case did not rise to the threshold of bad faith, an insurer could "abuse its legal prerogative in requesting a court to determine coverage issues."

34

953 S.W.2d at 949. Here, a reasonable jury could conclude that Indiana Insurance's assertion and prolonged continuation of an ultimately meritless coverage dispute reflected bad faith and caused its insured to endure significant emotional and financial strain. Nothing in *George* supports Indiana Insurance's position that it was entitled *on these facts* to a directed verdict as a matter of law.

Indiana Insurance also relies on *Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645 (6th Cir. 2013), asserting that the United States Court of Appeals for the Sixth Circuit, applying Kentucky law, has recognized that an insurer can raise coverage disputes without opening itself up to a bad faith claim. In that case, an employee of Youth Alive, a nonprofit corporation that provided services to at-risk youth, asked a sixteen-year-old to transport four children back to their homes from a Youth Alive event. *Id.* Unbeknownst to the employee, the sixteen-year-old did not have a driver's license and the car he was driving was stolen. *Id.* at 648. In a police pursuit following a traffic stop, the young driver crashed the vehicle, killing all four children. When the children's estates brought suit, Philadelphia Indemnity provided a defense to Youth Alive but filed a declaratory judgment seeking a determination that Youth Alive's insurance policies did not provide coverage for the claims because the sixteen-year-old driver was a "volunteer worker" or a "club member," bringing into play a specific policy exclusion. *Id.*[19]

---

[19] Youth Alive's excess liability policy did not provide coverage for any liability arising out of the use of an automobile but the organization's commercial general liability policy did provide such coverage unless the automobile was owned or operated

35

Youth Alive filed a bad faith counterclaim against Philadelphia Indemnity contending that the insurer's coverage positions had no reasonable basis in law or fact and that the insurer violated the common law duty of good faith and the UCSPA. *Id.* Ultimately, Philadelphia Indemnity settled the estates' wrongful death claims against Youth Alive, and the district court dismissed Youth Alive's bad faith claims based on its determination that Philadelphia Indemnity's coverage position was reasonable and had not been taken in bad faith. *Id.* at 649. The Sixth Circuit affirmed the dismissal, explaining that Youth Alive had failed to demonstrate that Philadelphia Indemnity lacked a reasonable basis in law for contesting coverage under both policies. *Id.* at 651.

Indiana Insurance misconstrues the holding and reasoning of *Philadelphia Indemnity* by suggesting that it stands for the proposition that an insurer can raise coverage disputes without opening itself to a bad faith claim. On the contrary, *Philadelphia Indemnity* indicates that whether bad faith liability exists is predicated on the reasonableness of the insurer's conduct—namely was there a "genuine dispute" as to the pertinent facts or law. *Id.* at 650 (citing *Empire Fire*, 880 S.W.2d at 889-90). In particular, "a bad faith claim is precluded as a matter of law as long as there is room for reasonable disagreement as to the proper outcome of a contested legal issue," but where the insurer's coverage obligation is not fairly debatable seeking to avoid coverage through a declaratory judgment claim can expose the insurer to

by the insured. 732 F.3d at 648. "Insured" was defined in the policy to include a "volunteer worker" or "club member." *Id.*

36

a bad faith claim. *Id.* In *Philadelphia Indemnity*, the coverage dispute focused on the application of specific policy language to the facts and the courts ultimately determined that the insurer's "position regarding the policy language was reasonable," *i.e.*, its position that the sixteen-year-old driver was a "volunteer worker" and hence an "insured" whose operation of the vehicle was excluded from coverage was reasonable. *Id.*

Unlike *Philadelphia Indemnity*, the coverage issue here was not about specific policy language and whether the Harris family's claims were covered. There was no "genuine dispute" that Demetre had contracted with Indiana Insurance to insure the Campbell County property and that the Harris family's claims arose from alleged contamination caused by that property. Nor was Indiana Insurance ever able to demonstrate that Demetre had concealed information about possible contamination of his or the Harris family's property from his insurer, the premise for the insurer's refusal to acknowledge coverage and a position it eventually abandoned. Indiana Insurance maintains that it should not be penalized for raising legal issues of first-impression (*e.g.*, the known loss rule or the loss-in-progress doctrine) and we agree, but we also agree with the trial court that it is necessary that there be sufficient factual support to establish the appropriateness of applying that first-impression legal theory. Here, there was clearly insufficient factual support even if Kentucky courts were to adopt the known loss/loss-in-progress rule. Moreover, even after Indiana Insurance abandoned these first-impression legal theories, it

raised the time-on-loss theory; a theory that Magi acknowledged at trial was without any factual justification whatsoever.

*George* and *Philadelphia Indemnity* simply do not support Indiana Insurance's position that it was entitled to judgment as a matter of law because the filing of a declaratory judgment claim precludes a finding of bad faith. Similarly Indiana Insurance was not entitled to a directed verdict on Demetre's bad faith claim simply because it ultimately met its contractual obligations by providing an attorney for Demetre and indemnifying him on the Harris family's claims.[20] In the context of a first-party bad faith claim, this Court has stated that our inquiry focuses on "whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 376 (Ky. 2000) (quoting *Zilisch v. State Farm*, 995 P.2d 276, 280 (Ariz. 2000)). We see no reason for a different standard where the insured is seeking a defense and indemnification pursuant to a

---

[20] Indiana Insurance maintains that there was no breach of contract. Specifically, Indiana Insurance claims that "[Demetre] did not cite to any provision of the insurance policy Indiana Insurance supposedly breached." Indiana Insurance states that "the trial court correctly recognized that Indiana Insurance had not breached the contract of insurance." In support of this proposition, Indiana Insurance quotes a portion of a sentence from the trial court's April 26, 2011 order denying Demetre's motion for declaratory relief. However, this statement is misleading based on the trial court's later statement on this matter, "I have never found and I made it very, very clear, that I never intended to find that Indiana Insurance did not breach its contract with, of insurance, with James Demetre." Referencing his April 26, 2011 order, the trial court explained that, "what I did, I found that I was not willing at that time, with what was before the court at that time, to summarily find that Indiana [Insurance] had done so." Ultimately, the trial court submitted the claim of breach of contract to the jury, which unanimously found for Demetre on that claim.

liability policy. The jury was entitled to hear, and did hear, about the handling of Demetre's claim from notification of his insurer in September 2008 through settlement with the Harris family in January 2012. Viewing all evidence in the light most favorable to Demetre and granting him "all reasonable inferences which may be drawn from the evidence," *Lewis*, 798 S.W.2d at 461, it is clear that the trial court properly denied Indiana Insurance's motion for directed verdict.

In answering specific individual interrogatories in the jury instructions, the jury unanimously found that Indiana Insurance violated the UCSPA by, among other things, lacking a reasonable basis to delay the coverage determination; misrepresenting pertinent facts or policy provisions; failing to acknowledge and act reasonably promptly upon communications relating to Demetre's claim; failing to adopt and implement reasonable standards for the prompt investigation of claims such as Demetre's; and not attempting in good faith to effectuate prompt, fair and equitable settlement of the claim after liability had become reasonably clear. The jury also unanimously found that Indiana Insurance, in its dealings with Demetre, engaged in unfair, false, misleading or deceptive acts or practices as prohibited by the Kentucky Consumer Protection Act. Finally, the jury unanimously found that Indiana Insurance breached its contract with Demetre with breach defined to include failing or refusing to perform essential contract terms; violating the fiduciary duties owed to a policy holder; or violating the covenant of good faith and fair

dealing. The evidence supporting most, if not all, of these conclusions is readily discernible from a review of the record.

Based on this same evidence, we cannot say that the verdict was "palpably or flagrantly" against the evidence so as to "indicate that it was reached as a result of passion or prejudice." *Lewis*, 798 S.W.2d at 461-62. By the time Indiana Insurance decided to accept coverage and settle the Harris family's claims, Demetre had been forced to expend substantial amounts of money defending himself. More significantly though, Demetre endured years of stress and worry about what would happen to him and his family due to Indiana Insurance's handling of the Harris family's claims and its litigation of the coverage issue. The reason "[a]n insured purchases insurance in the first place [is] so as not to suffer such anxiety, fear, stress, and uncertainty. The fact that an insurer finally pays in full does not erase the distress caused by the bad faith conduct." *Goodson v. American Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 417 (Colo. 2004).

In sum, Demetre presented sufficient evidence to support the jury's determination that Indiana Insurance breached its contract with Demetre by violating the implied covenant of good faith and fair dealing. There was also sufficient evidence supporting Demetre's claims that Indiana Insurance's acts

or omissions in this matter violated the UCSPA.[21, 22]  The trial court did not err in denying a directed verdict on either of those bad faith claims.

## B. Demetre's Kentucky Consumer Protection Act Claim

Indiana Insurance also contends that the trial court erred by not granting its motions for directed verdict and judgment notwithstanding the verdict on the Kentucky Consumer Protection Act claim.  Specifically, Indiana Insurance argues that Demetre's emotional distress damages and attorney fees cannot satisfy the Act's requirement of an "ascertainable loss of money or property."  See KRS 367.220(1) (granting right of recovery to person who "suffers any ascertainable loss of money or property" in conjunction with

---

[21] Indiana Insurance makes a barebones argument that the UCSPA was never intended to apply in this situation.  According to Indiana Insurance, the UCSPA "is designed to afford protections to persons asserting a claim for benefits under the policy, and Mr. Demetre never asserted a claim for benefits under the policy.  Instead, Mr. Demetre was an insured against whom a claim had been asserted."  We strongly disagree with this construction, which would render the UCSPA inapplicable to an insured seeking benefits purchased pursuant to a liability insurance policy.  As we have explained, Demetre made a "claim" on his policy when he alerted his insurer to the Harris family's claims and his own need for a defense and indemnification.  If Indiana Insurance failed to meet its UCSPA obligations, Demetre was permitted to bring suit for relief.

[22] Indiana Insurance also contends that Demetre's dissatisfaction with his first defense counsel, Schenkel, was a basis for his bad faith claim.  Indiana Insurance argues that this was error and that the case was permitted "to go to the jury based on rhetoric instead of evidence."  However, Demetre was very clear during the trial that his allegations of bad faith were not based on any alleged misconduct by Schenkel, but rather Indiana Insurance's conduct in handling the claim.  Further, in denying Indiana Insurance's motion for a judgment notwithstanding the verdict, the trial court explained "[t]his is about the insurance company conduct, not about its lawyers . . . . It's about adjuster and internal, you know, how an insurance company handles its claim, not how its lawyers handled its claims, because the adjusters make most of the calls on what, you know, what they can spend and who they can hire."  Contrary to Indiana Insurance's argument, the adequacy of Schenkel's representation was not at issue at trial, rather it was Indiana Insurance's conduct that was offered to prove bad faith.

41

unfair, false, misleading or deceptive business acts or practices). We need not reach the question of whether damages for emotional distress could constitute an "ascertainable loss of money or property" under the Act, given that Demetre's attorney fees incurred in his dispute with Indiana Insurance over the coverage issue were sufficient to submit the Consumer Protection Act claim to the jury.[23]

Indiana Insurance relies on two cases, *Yates v. Bankers Life*, 720 F. Supp. 2d 809 (W.D. Ky. 2010) and *Holmes v. Countrywide Fin. Corp.*, No. 5:08-CV-00205-R, 2012 WL 2873892 (W.D. Ky. 2012), to argue that attorney fees cannot satisfy the Act's requirement of an "ascertainable loss of money or property." In *Holmes*, several former customers of the Countrywide Financial Corporation filed suit due to the illegal disclosure of their personal financial information. 2012 WL 2873892 at *2. The plaintiffs contended that attorney fees amassed during their litigation against Countrywide constituted an "ascertainable loss" under the New Jersey Consumer Fraud Act. *Id.* at *14. The district court rejected this theory, which had been expressly repudiated by the New Jersey Supreme Court in *Weinberg v. Sprint Corp.*, 801 A.2d 281 (N.J. 2002), as "nonsensical" and insupportable under both the New Jersey and

---

[23] A review of closing arguments reveals that the almost $400,000 in attorney fees testified to by Demetre was what his counsel pointed to in addressing Interrogatory No. 11 of the jury instructions: "Do you believe from the evidence that Mr. Demetre suffered an ascertainable loss of money or property as a result of Indiana Insurance Company's conduct?" Interrogatory No. 10 had asked whether Indiana Insurance "in dealing with its policy holder, Mr. James Demetre, engaged in unfair, false, misleading, or deceptive acts or practices?" The jury found unanimously for Demetre on the liability interrogatory and nine jurors found in his favor on Interrogatory No. 11 regarding an ascertainable loss.

Kentucky consumer protection statutes. *Id.* *Yates* also involved a plaintiff relying on attorney fees that would prospectively accrue during the prosecution of the Consumer Protection Act claim as evidence of an "ascertainable loss." Logically, attorney fees that have not yet accrued but that are anticipated during the pursuit of a Consumer Protection Act claim cannot constitute an ascertainable loss giving rise to the claim. That, however, is not the issue here.

In the case at bar, Demetre was compelled to hire counsel and incurred almost $400,000 in attorney fees seeking to protect himself and defending the declaratory judgment cross-claim brought by Indiana Insurance on the coverage issue. As such, Demetre suffered an ascertainable economic loss in the form of attorney fees separate and apart from any attorney fees incurred in pursuing the Consumer Protection Act claims he brought against Indiana Insurance. Courts in sister states have recognized that such out-of-pocket attorney fees can constitute a loss supporting a statutory consumer protection act/unfair trade practices claim. *See, e.g., Columbia Chiropractic Grp., Inc. v. Trust Ins. Co.*, 712 N.E.2d 93, 96 (Mass. 1999) (chiropractic group committed unfair or deceptive acts or practices in attempting to collect medical bills from insurance company; company's litigation expenses in defense of collection suit, including attorney fees, were a loss of money recoverable under unfair trade practices statute); *Nationwide Mut. Ins. Co. v. Holmes*, 842 S.W.2d 335, 342 (Tex. Ct. App. 1992) (attorney fees that Holmes incurred "to induce Nationwide to indemnify him" in initial motor vehicle accident litigation recoverable as damages in deceptive trade practices act claim). As Demetre's personal

43

attorney fees were sufficient evidence of an "ascertainable loss of money" under the Consumer Protection Act, the trial court did not err in denying Indiana Insurance's motion for directed verdict or judgment notwithstanding the verdict on that claim.[24]

## II. Expert Testimony is Unnecessary to Substantiate Damages for Emotional Distress in a Bad Faith Case.

Relying on this Court's opinion in *Osborne*, Indiana Insurance argues that Demetre was required to present expert medical or scientific proof to support his claim for emotional distress damages. Further, because Demetre relied solely on his own testimony to establish his emotional distress, Indiana Insurance alleges that this evidence was insufficient to sustain an award of emotional distress damages. Demetre counters that *Osborne*'s heightened proof requirement—expert testimony regarding severe emotional distress—applies only to claims of negligent infliction of emotional distress.

In *Osborne*, the plaintiff was sitting in her home when an airplane crashed through the roof causing considerable damage to the home and its contents. 399 S.W.3d at 6. Fortunately, Osborne was not struck and she suffered no physical injury. *Id.* She tried to bring an action against the pilot of the plane, but her counsel, Keeney, failed to file suit in a timely manner. *Id.* at 7. Osborne later sued Keeney for breach of contract, legal malpractice, and

---

[24] We reject Indiana Insurance's suggestion that the attorney fees cannot be an ascertainable loss under the Act because the jury was not asked to award them as damages. Further, to the extent Indiana Insurance suggests it was entitled to judgment because there was no evidence of the acts or practices prohibited by the Consumer Protection Act, we reject that argument as well.

44

fraud and deceit, and obtained a jury verdict in her favor on all claims. *Id.* However, the Court of Appeals reversed several portions of the jury's verdict, including the damages for pain and suffering because she experienced no physical impact in the plane crash. *Id.* at 8. Specifically, the case-within-the case—Osborne's original action against the pilot—was based, at least in part, on negligent infliction of emotional distress and our law then required a physical impact to support such a claim.

At the time *Osborne* was decided, Kentucky was one of only six courts nationwide that adhered to the impact rule. *Id.* at 14, n.39. Principally, the impact rule held that "an action will not lie for fright, shock[,] or mental anguish which is unaccompanied by physical contact or injury." *Id.* (quoting *Deutsch v. Shein*, 597 S.W.2d 141, 145-46 (Ky. 1980)). While the impact rule was longstanding, having been adopted by Kentucky in 1903, the *Osborne* Court determined that the rule had become "difficult in its application and ha[d] been repeatedly stretched and diluted." *Id.* at 15. Accordingly, the Court concluded that the impact rule should be abandoned in favor of an analysis based on general negligence principles. *Id.* at 17. Further, relying on the Tennessee Supreme Court's decision in *Camper v. Minor*, 915 S.W.2d 437 (Tenn. 1996), the *Osborne* Court resolved that recovery in those cases should be limited to those instances where there was a "severe" or "serious" emotional injury. *Id.* In conformity with *Camper*, the *Osborne* Court directed that "a plaintiff claiming emotional distress damages must present expert medical or scientific proof to support the claimed injury or impairment." *Id.* at 17-18.

45

After *Osborne* was decided, it was unclear whether *Osborne*'s heightened requirement of expert testimony to establish emotional damages was restricted to claims of intentional or negligent infliction of emotional distress, or if expert testimony is always necessary to establish emotional distress damages.[25] While this Court has not directly addressed this issue, a number of federal courts, sitting in diversity suits, have issued conflicting interpretations of. *Osborne*.[26] As this is an issue of state law, we are not bound by these decisions, but we often consider federal decisions to be persuasive authority. *See Embs v. Pepsi-Cola Bottling Co. of Lexington, Kentucky*, 528 S.W.2d 703, 705 (Ky. 1975).

In *Sergent v. ICG Knott County*, LLC, No. CIV. 12-118-ART, 2013 WL 6451210, at *6 (E.D. Ky. 2013), a division of the United States District Court,

---

[25] Four years earlier in *Childers Oil Co. Inc. v. Adkins*, 256 S.W.3d 19 (Ky. 2008), an age-discrimination action, this Court had unanimously affirmed an emotional distress damage award premised only on the plaintiff's testimony. The Court distinguished between the tort action for intentional infliction of emotional distress and a statutory compensatory damage award that included damages for emotional distress. It did not address the issue of expert testimony.

[26] Demetre argues that in *Banker v. Univ. of Louisville Athletic Ass'n, Inc.*, 466 S.W.3d 456 (Ky. 2015), this Court implicitly limited *Osborne*'s expert proof requirement to negligent infliction of emotional distress cases. Banker alleged that she had been discharged for engaging in conduct protected by the Kentucky Civil Rights Act. *Id.* at 458. At trial, Banker and her mother provided testimony in support of her claim of emotional distress, and the jury ultimately awarded Banker $300,000 in emotional distress damages. *Id.* On appeal, the University of Louisville Athletic Association (ULAA) argued that while this lay testimony may have supported an award of some damages, it was insufficient to support the jury's award. *Id.* As such, ULAA disputed only the amount of the award, not that Banker had failed to provide expert evidence to sustain any emotional distress damages. This Court concluded that the trial court did not abuse its discretion in refusing to alter the jury's award. *Id.* at 464. Plainly, the *Banker* Court did not address *Osborne* as the necessity of expert testimony to support Banker's emotional damages was not raised. Accordingly, we do not find *Banker* to be controlling in the resolution of the case at bar.

Eastern District of Kentucky, concluded that "plaintiffs seeking damages for emotional distress must adduce expert testimony in support of their claims." Noting that the *Osborne* Court "gave no indication that the expert-testimony requirement is limited to impact-free cases," that district court found that the reasoning employed by the *Osborne* Court supports a general rule requiring proof by medical experts to recover emotional distress damages in a negligence action. *Id.* at *7.[27]

However, this interpretation of *Osborne* was rejected by a judge of the United States District Court, Western District of Kentucky, in *MacGlashan v. ABS Lincs KY, Inc.*, 84 F. Supp. 3d 595 (W.D. 2015). In *MacGlashan*, the plaintiff was working as a nurse manager when she was notified that a patient with a sulfa allergy had been treated with a sulfa-based antibiotic. *Id.* at 598. After the patient was transported to a different hospital for medical treatment, MacGlashan was ordered to investigate the incident. *Id.* As part of her investigation, MacGlashan visited the patient and obtained the patient's medical records. *Id.* Afterwards, MacGlashan was fired by the hospital. *Id.* Claiming that she was fired based on a false allegation that she violated the Health Insurance Portability and Accountability Act of 1996 (HIPPA), MacGlashan filed suit in federal court alleging retaliation, wrongful discharge, and defamation. *Id.*

---

[27] In a separate unpublished opinion, *Adkins v. Shelter Mut. Inc. Co*, No. 5:12-173-KKC, 2015 WL 4548728 (E.D. Ky. 2015), a different division of the United States District Court, Eastern District of Kentucky, citing *Sergent*, concluded that *Osborne* applied to all negligence actions and dismissed Adkins' claims as her own testimony was insufficient evidence of emotional distress.

47

On a motion for summary judgment, the hospital argued, citing *Osborne*, that MacGlashan's claim for emotional distress damages should be denied due to her failure to present expert testimony. *Id.* at 604-05. The district court acknowledged *Sergent*, but disagreed with the analysis in that case, specifically the conclusion that the *Osborne* court "gave no indication that the expert-testimony requirement is limited." *Id.* Further, the district court explained that "[t]his [*Sergent's*] interpretation is questionable because the *Osborne* court was clearly talking in the context of an NIED [negligent infliction of emotional distress] claim." *Id.* The district court noted that other federal courts had also rejected *Sergent's* interpretation of *Osborne*. *See Minter v. Liberty Mut. Fire Ins. Co.*, No. 3:11-CV-00249-S, 2014 WL 4914739 at *5, n.1 (W.D. Ky. 2014) (responding to a bad faith claim, "Liberty Mutual incorrectly asserts that, in order to recover emotional distress damages, Minter must meet the strict standard of proof that is required for a Negligent or Intentional Infliction of Emotional Distress claim ('NIED' and 'IIED')"); *Smith v. Walle Corp.*, No. CIV. 5:13-219-DCR, 2014 WL 5780959 at *4 (E.D. Ky. 2014) (district court was not persuaded that "expert evidence is necessary to substantiate a claim [of damages for emotional distress] for discrimination or retaliation under the KCRA)."[28] Based on the foregoing, the *MacGlashan* court concluded that

---

[28] In *Minter*, a different division of the United States District Court, Western District of Kentucky, went on to explain that *Osborne's* expert requirement made sense in negligent or intentional infliction of emotional distress cases, "as the elements of such a claim specifically require 'severe or serious emotional injury.'" 2014 WL 5780959 at *4 (citing *Osborne*, 399 S.W.3d at 17). However, in the case before the district court:

48

"*Osborne*'s requirement for expert testimony is limited to NIED and intentional infliction of emotional distress claims." *Id.*[29]

Although Indiana Insurance urges the Court to extend the requirement of expert testimony to support recovery of emotional distress damages to a bad faith claim, it cites no authority for the view other than *Sergent* and a handful of other negligence cases from the Eastern District of Kentucky that have followed *Sergent*. Specifically, Indiana Insurance does not cite a single case from any other jurisdiction in the country imposing such a requirement in a bad faith case, and we have found none.

Notably, in *Estate of Amos v. Vanderbilt Univ.*, 62 S.W.3d 133 (Tenn. 2001), the Tennessee Supreme Court declined to extend *Camper*'s (the case

> bad-faith conduct in settling a claim is alleged to have caused the Plaintiff emotional harm. This is not a claim sounding in negligence, NIED, or IIED. Liberty Mutual cites no authority applying *Osborne* in the context of bad faith. Nor could it, because plaintiffs claiming statutory violations have recovered for humiliation, embarrassment, or nervous shock, and the courts allowing those recoveries did not require evidence of serious or severe emotional injury.

*Id.* (citations omitted). Indiana Insurance argues that *Minter* closely resembles the case at bar, and that we should take note that Minter's claims of emotional damages, based solely on her testimony, were insufficient to survive summary judgment. *Id.* at *5. However, *Minter* is distinguishable. While Demetre's testimony was the sole basis for his recovery for emotional damages, he testified at length and was very specific about the impact of Indiana Insurance's bad faith on his mental health and wellbeing. There was apparently no such testimony in the *Minter* case.

[29] Indiana Insurance also cites the Court to an earlier unpublished memorandum opinion and order by the author of *MacGlashan* issued in *Powell v. Tosh*, No. 5:09-CV-00121-TBR, 2013 WL 1878934 (W.D. Ky. 2013). In *Powell*, the district court denied the plaintiffs' motion to reconsider its grant of summary judgment on their negligence claims, due to the failure to provide expert proof of emotional distress. *Id.* at *4-5. However, the *Powell* case has little persuasive value, as it is clear that the district court reconsidered its interpretation of *Osborne* as expressed in its more recent and published *MacGlashan* decision.

relied on by this Court in *Osborne*) heightened standard of proof for the recovery of emotional damages in negligent infliction of emotional distress claims to all claims for emotional damages. In that case, Amos underwent jaw surgery at Vanderbilt University Medical Center and received a blood transfusion, including a unit of blood that had been contaminated with human immunodeficiency virus (HIV). *Id.* At the time (1984), Vanderbilt did not test blood for HIV and did not have a policy mandating patient notification when a blood transfusion had occurred. *Id.* In 1991, Amos gave birth to a daughter who died shortly after birth from HIV. Subsequent testing led to Amos's discovery of her own HIV infection. *Id.*

Amos filed suit against Vanderbilt and recovered at trial on her claims for wrongful birth, negligence, and negligent infliction of emotional distress. *Id.* The Tennessee Court of Appeals reversed the estate's award for emotional injuries, however, "[b]ecause the Amoses failed to present expert or scientific testimony of serious or severe emotional injury, as required under this Court's decision in *Camper.*" *Id.* at 136.

On appeal, the Tennessee Supreme Court reversed, declining to extend *Camper*'s requirements of expert medical or scientific proof and serious or severe injury to all negligence cases where emotional damages are sought. *Id.* at 134. Specifically, the Court noted that "[t]he special proof requirements in *Camper* are a unique safeguard to ensure the reliability of 'stand-alone' negligent infliction of emotional distress claims." *Id.* at 136-37 (citing *Camper*, 915 S.W.2d at 440; *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999)).

50

While the nature of "stand-alone" emotional injuries creates a risk of fraudulent claims, that risk is reduced "however, in a case in which a claim for emotional injury damages is one of multiple claims for damages." *Id.* (citations omitted). "When emotional damages are a 'parasitic' consequence of negligent conduct that results in multiple types of damages, there is no need to impose special pleading or proof requirements that apply to 'stand-alone' emotional distress claims." *Id.* (citations omitted). As the *Amos* Court reasoned

> [i]mposing the more stringent *Camper* proof requirements upon all negligence claims resulting in emotional injury would severely limit the number of otherwise compensable claims. Such a result would be contrary to the intent of our opinion in *Camper*—to provide a more adequate, flexible rule allowing compensation for valid "stand-alone" emotional injury claims.

*Id.* at 137 (citing *Camper*, 915 S.W.2d at 446).

Indiana Insurance argues that *Amos* is distinguishable from the case at bar as Demetre only sought recovery for emotional damages, unlike the *Amos* plaintiffs who requested "damages for emotional injuries stemming from those causes of action as well as . . . other damages." It is true that the only compensatory damages that the jury was asked to award in this case were damages for "emotional pain and suffering, stress, worry, anxiety, or mental anguish," but it is further true that Demetre testified to an out-of-pocket loss in the form of the almost $400,000 in attorney fees that he incurred litigating with Indiana Insurance to obtain coverage. Demetre sought to recover these damages, along with his other attorney fees, through a fee award from the

51

judge. Thus, this case is not one where the only injury identified by the plaintiff is emotional distress.

Nor is this case a negligence case like *Amos*. It is a bad faith case and Kentucky has long recognized that "damages for anxiety and mental anguish are recoverable in an action for statutory bad faith" provided there is "clear and satisfactory" evidence from which "the jury could infer that anxiety or mental anguish in fact occurred." *Motorists Mut. Ins. Co.*, 996 S.W.2d at 454.

Moreover, we share the concern expressed by the *Amos* Court that the imposition of the stringent proof requirements adopted by this Court in *Osborne* for all claims for emotional damages would dramatically limit the otherwise compensable claims that arise in bad faith cases as well as a variety of other actions. Such a result would not be conducive to the interests of justice. Accordingly, we hold that *Osborne*'s requirement of expert medical or scientific proof is limited to claims of intentional or negligent infliction of emotional distress.

Our conclusion is due in part to the recognition that claims for emotional damages grounded in breach of contract or violation of statute, such as those alleged by Demetre in the case at bar, are less likely to be fraudulent than those advanced under a free-standing claim of intentional or negligent infliction of emotional distress. To evaluate whether emotional damages are appropriate in those cases that do not allege the free-standing torts of intentional or negligent infliction of emotional distress, we have historically relied on our trial courts and the jury system to evaluate the evidence and determine the merits

52

of the alleged claims. *See Curry*, 784 S.W.2d at 178 ("Throughout the history of Anglo–American law, the most important decisions societies have made have been entrusted to duly empaneled and properly instructed juries. Decisions as to human life, liberty and public and private property have been routinely made by jurors and extraordinary confidence has been placed in this decision-making process."); *Goodson*, 89 P.3d at 417 ("[T]he jury system itself serves as a safeguard; we routinely entrust the jury with the important task of weighing the credibility of evidence and determining whether, in light of the evidence, plaintiffs have satisfied their burden of proof."). We see no compelling reason to depart from this view.

With this standard established we turn to the facts in the case at bar to determine whether there was "clear and satisfactory" proof to support Demetre's recovery of emotional damages. *See Motorists Mut. Ins. Co.*, 996 S.W.2d at 454 (citations omitted). Indiana Insurance claims that any stress Demetre suffered was due solely to his being sued by Harris: "[i]t is not surprising that Mr. Demetre may have been experiencing stress, since a claim had been made against him and he had been sued by Ms. Harris. Those are certainly stress-inducing events." This causal explanation offered by Indiana Insurance for Demetre's stress is self-serving as it purposefully omits any recognition that Demetre endured stress due to Indiana Insurance's lackluster handling of the Harris family's claims and subsequent legal action against Demetre. The jury heard extensive evidence about the totality of the circumstances surrounding the Harris family's claims and Demetre's

interactions with his insurer, and it was a factual issue for the jury as to whether Demetre suffered any emotional distress and, if he did, whether Indiana Insurance bore any responsibility on that score.

Contrary to Indiana Insurance's assertions, Demetre presented sufficient evidence to establish his emotional distress during the four years prior to trial, describing the experience in some detail as a "total disaster," and a "nightmare." Additionally, Demetre testified to daily stress wondering what would happen to his family due to his potentially uninsured million-dollar exposure in the *Harris* litigation, a case which would deplete his financial resources and likely force him to declare bankruptcy. Further, Demetre explained that the stress impacted all aspects of his life, from his marital life to his business relations and resulted in a perpetual loss of sleep. Lastly, Demetre testified to seeking spiritual comfort from his priest to weather the stress caused by Indiana Insurance's conduct. Based on this evidence, we conclude there was sufficient clear and satisfactory proof presented to sustain the jury's award of emotional distress damages.[30]

---

[30] Indiana Insurance suggests this Court should revisit the genesis of the tort of bad faith in Kentucky and adopt the requirements of "severe" emotional distress and "substantial damages aside and apart from the emotional distress" articulated in *Anderson v. Cont'l Ins. Co.*, 271 N.W.2d 368, 378 (Wis. 1978). This argument was not raised in the motion for discretionary review but, in any event, we are not inclined to change the *Motorists Mut. Ins. Co.* standard. When *Anderson* was rendered, Kentucky was grappling with whether there should be a tort action against an insurance company for breach of an implied covenant of good faith and fair dealing. In fact, the Court expressly rejected the tort of bad faith in *Federal Kemper Ins. Co. v. Hornback*, 711 S.W.2d 844, 845 (Ky. 1986) *overruled by Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176 (Ky. 1989)), but in his dissent Justice Leibson advocated adopting the Wisconsin Supreme Court's three-part *Anderson* test for a bad faith claim. 711 S.W.2d at 846-47 (citing *Anderson*, 271 N.W.2d at 371.) Eventually, the *Curry* Court (and later *Wittmer v. Jones*) adopted *Anderson*'s three-part test, but we have never

## III. Indiana Insurance's Two Remaining Allegations of Error Are Not Properly Before This Court For Review.

In one of its final claims of error, Indiana Insurance contends that even if this Court concludes that a directed verdict or judgment notwithstanding the verdict was not appropriate, that a new trial is nonetheless warranted due to: 1) the trial court's exclusion of the testimony of Tim Schenkel and Don Lane; and 2) the trial court's jury instructions. Prior to trial, Demetre asked the trial court to bar Indiana Insurance from deposing or calling Lane and Schenkel as witnesses at trial due to the insurer's violation of the deadlines in the parties' agreed scheduling order. The agreed scheduling order mandated that the parties list all potential witnesses in their written discovery responses by March 30, 2012, or depose them by the April 30, 2012 discovery cut-off. The trial court was unsympathetic to Indiana Insurance's belated request to name

---

embraced *Anderson*'s requirement that the plaintiff must "prove substantial damages aside and apart from the emotional distress," nor have we barred recovery for emotional distress damages that were not severe. *See Motorists Mut.*, 996 S.W.2d at 454 (damages for anxiety and mental anguish are recoverable in an action for statutory bad faith, if clear and satisfactory evidence supports inference that anxiety or mental anguish occurred). In not requiring "severe" emotional distress, Kentucky is certainly not alone. *See, e.g., Farr v. Transamerica Occidental Life Ins. Co. of California*, 699 P.2d 376, 382 (Ariz. Ct. App. 1984) (emotional distress damages could be awarded in a bad faith case, "even though the defendant did not intentionally cause the distress and even though the distress was not severe."); *Jacobsen v. Allstate Ins. Co.*, 215 P.3d 649 (Mont. 2009) (plaintiff was not required to demonstrate serious or severe emotional distress to recover emotional distress damages arising out of a bad faith claim). Nor are we alone in not requiring proof of economic or physical loss caused by the insurer's bad faith. *See, e.g., Goodson*, 89 P.3d at 412 ("We hold that, in a tort claim against an insurer for breach of the duty of good faith and fair dealing, the plaintiff may recover damages for emotional distress without proving substantial property or economic loss."); *Miller v. Hartford Life Ins. Co*, 268 P.3d 418, 432 (Haw. 2011) ("If a first-party insurer commits bad faith, an insured need *not* prove that the insured suffered economic or physical loss caused by the bad faith in order to recover emotional distress damages caused by the bad faith.") (emphasis in original).

Schenkel and Lane as witnesses noting that "[w]here, as here, the parties, represented by seasoned counsel, have negotiated and set specific deadlines and memorialized them in an Agreed Scheduling Order, the [trial court] will not vacate them, absent unusually compelling circumstances." The court ruled that neither Lane nor Schenkel could testify.

On appeal the Court of Appeals observed that Schenkel and Lane were classic rebuttal witnesses and that Demetre had sufficient time to depose both witnesses after the trial date was moved from June 2012 to September 2012 due to courthouse construction. Although the Court of Appeals concluded that the trial court abused its discretion in barring Schenkel and Lane's testimony, the Court of Appeals deemed that error harmless. The Court of Appeals was frustrated by Indiana Insurance's failure to "cite to the record where the avowal testimony can be found or offer the content of that testimony" and to argue "how the exclusion was prejudicial or demonstrate that the outcome of the trial would have been different." Accordingly, the Court of Appeals determined that Indiana Insurance failed to provide a basis for that court to conclude the trial court's error constituted reversible error.

Now before this Court, Indiana Insurance again contends that it was reversible error for the trial court to exclude Lane and Schenkel's testimony. However, Indiana Insurance failed to properly raise this issue before this Court, having neglected in its motion for discretionary review to ask the Court to address the exclusion of this testimony. Without any mention of this issue in the motion for discretionary review, it is not properly before the Court. *See*

*Ellison v. R & B Contracting, Inc.*, 32 S.W.3d 66, 71 (Ky. 2000) ("The Ellisons' Motion for Discretionary Review focused solely on the directed verdict issue and made no mention of the punitive damage and injunctive relief issues they raised before the Court of Appeals. Although those issues were briefed before us and addressed at oral argument, we find that neither the punitive damages nor the injunctive relief issue is properly before this Court. CR 76.20(3)(d))." Accordingly, we decline review.

Additionally, Indiana Insurance alleges that the trial court's jury instructions were erroneous because the jury was permitted to award punitive damages if it concluded Indiana Insurance breached its contract with Demetre. The Court of Appeals rejected this argument explaining that "[t]he trial court instructed the jury that it could only award punitive damages if it found that Indiana Insurance violated the Unfair Claims Settlement Practices Act or the Consumer Protection Act. No punitive damages were authorized under the 'breach of contract' instruction and, therefore, Indiana Insurance's claimed error is without merit." This jury instruction claim, like the exclusion of testimony from Lane and Schenkel, was not raised in Indiana Insurance's motion for discretionary review and therefore we decline to examine it.[31]

---

[31] Although we decline to review this issue on the merits, we concur with the Court of Appeals' reading of the jury instructions, *i.e.*, the instructions did not allow the jury to award punitive damages for breach of contract. See Jury Instruction No. 10.

## CONCLUSION

For the reasons explained herein, we affirm the Court of Appeals and thereby affirm the judgment entered by the trial court following the jury's verdict.

All sitting. Minton, C.J.; Cunningham, Keller, Venters, and Wright, JJ., concur. VanMeter, J., dissents by separate opinion.

VANMETER, J., DISSENTING: I respectfully dissent. In *Guaranty Nat'l Ins. Co. v. George*, 953 S.W.2d 946, 949 (Ky. 1997), this court recognized that an insurer may permissibly advise its insured that it is defending under a reservation of rights and file a declaration of rights action when coverage under the policy is unclear. In my view, the circumstances surrounding the property's prior use, and the timing of Demetre's obtaining coverage and the Harrises' claim gave rise to a reasonable belief that Demetre may have been aware of the potential claim, which belief the insurer was entitled to investigate. The fact that the insurer ultimately changed course and dropped this argument does not mean its initial belief was unreasonable. My concern with the majority opinion is that, in the future, insurance companies having reservations about questionable claims will be placed between the proverbial "rock and a hard place" notwithstanding decisions in cases such as *Hollaway v. Direct Gen. Ins. Co. of Mississippi, Inc.*, 497 S.W.3d 733, 739 (Ky. 2016) (stating "KUCSPA only requires insurers to negotiate reasonably with respect to claims; it does not require them to acquiesce to a third party's demands[]"). Additionally, my view is that Demetre's proof of emotional damages was

insufficient. Litigation is stressful, and this case will be cited for the proposition that litigation stress is compensable.

As to Demetre's claim for violation of Kentucky Consumer Protection Act, KRS 367.220, I question whether Demetre satisfied the requirement that he "suffered any ascertainable loss of money or property, real or personal" as required by the statute since his instructed damages were limited to "emotional pain and suffering, stress, worry, anxiety or mental anguish."

Finally, with respect to the common law breach of contract claim, our longstanding case law recognizes the "universal rule that damages for mental anguish is not recoverable for the violation of a contract unaccompanied with physical injury." *Clark v. Life & Cas. Ins. Co.*, 245 Ky. 579, 582, 53 S.W.2d 968, 970 (1932). While the proof in the case demonstrates that Demetre expended almost $400,000 for attorney's fees in defending the coverage issue, the jury instructions only articulated a damage claim for Demetre's "emotional pain and suffering, stress, worry, anxiety or mental anguish." Based on a failure of proof for the requisite damages, the trial court erred in failing to direct a verdict in favor of Indiana on this count. Further, KRS 411.184(4), prohibits an award of punitive damages for breach of contract.

COUNSEL FOR APPELLANT:

Donald Lee Miller, II
Kristin M. Lomond
Quintairos, Prieto, Wood & Boyer, P.A.

Michael D. Risley
Bethany A. Breetz
Stites & Harbison, PLLC

COUNSEL FOR APPELLEE:

Kevin Crosby Burke
Burke Neal PLLC

Robert Edward Sanders
Justin Aaron Sanders
The Sanders Law Firm

Jeffrey Sanders
Jeffrey M. Sanders PLLC

COUNSEL FOR AMICUS CURIAE,
THE INSURANCE INSTITUTE OF KENTUCKY:

Ronald L. Green
Green, Chesnut & Hughes, PLLC

COUNSEL FOR AMICUS CURIAE,
KENTUCKY JUSTICE ASSOCIATION:

Hans George Poppe, Jr.
Warner Thomas Wheat
The Poppe Law Firm