RENDERED: MARCH 23, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0163-DG

LAUREN SAVAGE, INDIVIDUALLY AND      APPELLANTS
AS ADMINISTRATRIX OF THE ESTATE
OF JAMES SAVAGE

ON REVIEW FROM COURT OF APPEALS
V.      NO. 2017-CA-0615
JEFFERSON CIRCUIT COURT NO. 12-CI-006824

CO-PART OF CONNECTICUT, INC.      APPELLEES
D/B/A CO-PART AUTO AUCTIONS;
TOM TAYLOR; DANIEL BOND; WILLIS
JOHNSON; PAUL STYER; WILLIAM
FRANKLIN; ALLSTATE INSURANCE
COMPANY; PROPERTY & CASUALTY
INSURANCE COMPANY OF HARTFORD;
LIBERTY MUTUAL FIRE INSURANCE
COMPANY; AUTO USADOS FELIX;
FELIX VENTURA BARRAZA;
CHAPA, INC.; MARGARITA CHAPA; AND
OSCAR RAMOS

AND

2021-SC-0167-DG

CO-PART OF CONNECTICUT, INC      APPELLANTS
D/B/A CO-PART AUTO AUCTIONS;
TOM TAYLOR; DANIEL BOND; WILLIS
JOHNSON; PAUL STYER; AND
WILLIAM FRANKLIN

LAUREN SAVAGE, INDIVIDUALLY AND                                        APPELLEES
AS ADMINISTRATRIX OF THE ESTATE
OF JAMES SAVAGE


**OPINION OF THE COURT BY JUSTICE CONLEY**

**AFFIRMING IN PART & REVERSING IN PART**

This case arose out of a series of events in 2012 that culminated in the death of James Savage on I-65 near Louisville after he was thrown from his motorcycle and runover by Oscar Ramos. This case is before us on review from the Court of Appeals' sixty-nine-page opinion that ultimately remanded back to the Jefferson Circuit Court for a new trial. The Court of Appeals addressed twenty-four separate issues that occurred in the circuit court between initiation of the lawsuit in 2012 and final disposition in 2017. Preservation, or lack thereof, has distilled the appeal before this Court to only a handful of issues. Before we address the underlying facts and law, however, it is necessary to delineate precisely what this Court is and is not addressing. We affirm in part, reverse in part, and remand for a new, partial trial on damages.

## I.     Issues Identified on Appeal

Our rules require a party to address specifically each issue, the relevant law, and a statement as to why the judgment below should be reviewed, in a

motion for discretionary review. CR[1] 76.20(3)(d).[2] Failure to comply with this rule precludes review. *Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12, 41 (Ky. 2017) (citing *Ellison v. R & B Contracting, Inc.,* 32 S.W.3d 66, 71 (Ky. 2000)). Both Savage and Co-part argue that the other has failed to comply with CR 76.20(3)(d); consequently, several issues are said to be improperly appealed and not truly before the Court.

Co-part formulated two questions of law to be reviewed but then discussed in the body of its motion two additional issues. Savage did not formulate any questions but rather stated there were three questions of first impression and used each issue as a subheading in the body of her motion. Moreover, Savage has briefed the issue of Liberty Mutual Fire Insurance's dismissal and Allstate Insurance Company's ownership of the Toyota Tacoma under Kentucky law as opposed to Maryland law, when neither of those issues were mentioned in her motion for discretionary review. Specifically, in Allstate's case, the motion for discretionary review mentions Allstate's ownership only in the context of KRS Chapter 186A.500. But the trial court and Court of Appeals determined Allstate's ownership under Maryland law. Nowhere in the motion for discretionary review is there a conflict-of-laws analysis, much less a discussion of Maryland law; nowhere does it even hint that the Court of Appeals committed error by applying Maryland law, and such an allegation

---

[1] Kentucky Rules of Civil Procedure.
[2] This appeal was commenced prior to the new Rules of Appellate Procedure taking effect. Under the current rules, the proper citation is to RAP 44(c)(5).

would be perplexing since the Court of Appeals stated all parties agreed Allstate's ownership was controlled by Maryland law.

Those issues clearly raised and argued in compliance with CR 76.20(3)(d) will be addressed. *Demetre,* 527 S.W.3d at 41. Therefore, we consider the properly appealed issues to be

- first, was Property & Casualty Insurance Company of Hartford the owner of the Jeep Wrangler at issue according to KRS 186A.530(3), and was Co-part required to obtain proof of insurance pursuant to KRS[3] 186A.215 and 186A.220;

- second, do KRS 186A.100 and 186A.520 require or prohibit placement of a temporary registration tag on a vehicle with a salvage title;

- third, whether the Court of Appeals correctly interpreted and applied KRS 189.224 to Co-part;

- fourth, did the Court of Appeals improperly engage in fact-finding that subsequently, according to Co-part, affected its judgment on other issues;

- fifth, does strict liability apply to KRS Chapter 186A.500;

- sixth, did the Court of Appeals err when it ruled the trial court abused its discretion by allowing Co-part to withdraw an admission; and

---

[3] Kentucky Revised Statutes.

- finally, did the trial court properly preclude from the damages calculation the Social Security Disability benefits of James Savage pursuant to *Aull v. Houston*, 345 S.W.3d 232 (Ky. App. 2010).

## II.    Facts and Procedural Posture

We adopt the factual recitation of the Court of Appeals as our own, with one exception explained below.

> This is a multi-party action relating to an automobile accident that occurred on March 6, 2012. The underlying facts and relationships among the parties are unique and defy simple explanation. Likewise, the procedural history and complex issues presented would be difficult to imagine if presented as a fact-pattern for an essay question on the bar examination. Therefore, we shall first set out the parties and the factual history of this matter, followed by the procedural history of this action.
>
> Co-part provides online motor vehicle auction services. It maintains facilities throughout the country, and most relevant to this case, has locations in Finksburg, Maryland and Louisville, Kentucky. Co-part is a licensed motor vehicle dealer and auction dealer in both Maryland and Kentucky. Among other things, Co-part contracts to store and sell salvage vehicles on behalf of insurance companies who have acquired them after declaring them a total loss.
>
> Prior to the accident, Allstate Insurance Company (Allstate) acquired title to a totaled 2003 Toyota Tacoma from an insured. Thereafter, Allstate obtained a Maryland salvage title and delivered the vehicle to Co-part's Maryland location. Similarly, Property and Casualty Insurance Company of Hartford (Hartford) acquired title to a totaled 2004 Jeep Wrangler from an insured. Hartford delivered the Jeep and the Kentucky salvage title documents to the Co-part location in Louisville.
>
> Under its service agreements with insurance companies, Co-part is required to do a "run and drive" verification and to state in its auction description whether the vehicles are drivable or towable. The service agreements also required Co-part to maintain tires on

all vehicles where practicable. The agreements permitted Co-part to refuse to release any vehicle for any reason. Co-part advertised the Toyota as drivable but determined that the Jeep was in a non-run and non-towable condition. Co-part included these descriptions in its online advertising of the vehicles.

Sales and delivery of vehicles are limited only to paid Co-part "members." Members receive a number, which is used to access Co-part auctions. Members also use the number to fund a credit balance for payment of online auction purchases. Co-part facilitates the transfer of title from the insurer to the buyer. Co-part either offers to deliver a purchased vehicle to the buyer for a fee or releases the vehicle to an authorized representative of the buyer. In the case of the latter, the representative must present the buyer identification number and the lot number of the specific vehicle. Upon receipt of this information, Co-part would deliver the vehicle to the buyer at a "bullpen" within Co-part's compound. In the case of a salvage or non-drivable vehicle, Co-part would deliver the vehicle to the bullpen using a forklift.

In February, the [above-mentioned] vehicles were sold to Ventura Felix Barraza d/b/a Autos Usados Felix (AUF), a used auto and parts dealer located in Los Mochis, Sinaloa, Mexico. AUF sent Oscar Ayon Ramos (Ramos) to pick up the vehicles. On his way to pick up the vehicles, Ramos obtained two Arizona Restricted Use Three-Day Permits through Chapa Auto Sales (Chapa), a used car-dealer located in El Paso, Texas. Ramos then proceeded to Maryland to pick up the Toyota.

Following the online sales, Co-part, on Allstate's behalf, executed an assignment and warranty of title on the Toyota's Certificate of Salvage in favor of AUF. Similarly, Co-part, on Hartford's behalf, executed a transfer of the Jeep's Kentucky Salvage title to AUF. AUF directed Co-part to deliver the title document to the Jeep to "Ramon Martar Bubio," and Co-part's records indicate that it did so on March 2, 2012.

On March 5, 2012, Ramos appeared at Co-part's Maryland facility. He provided the AUF member number and lot number of the Toyota. Co-part then delivered the Toyota to Ramos. Co-part also gave Ramos the Toyota's Certificate of Salvage, which it had executed on behalf of Allstate.

6

Ramos then affixed the Arizona Permit to the Toyota and drove the vehicle to Co-part's Louisville facility. On March 6, he arrived at the Louisville facility, where he presented the AUF member number and lot number of the Jeep. As with the Toyota, Co-part executed the dealer assignment portion of the Jeep's title on Hartford's behalf. At the direction of AUF, the title was delivered to Bubio on March 2.

At this point the facts become muddled. The Court of Appeals recounted, "Upon receipt of the documentation, Co-part delivered the Jeep to Ramos. Ramos then affixed the Arizona Permit to the Jeep and attached a tow bar between the Toyota and the Jeep. Ramos then left the Co-part facility with the Jeep being towed by the Toyota." This was based on admissions of Chapa. But Co-part has appealed this specific statement as without any evidentiary basis against it because admissions of one co-defendant generally cannot be used against another, thus, improper fact-finding. Co-part's proffered explanation for how the Jeep left the Louisville facility is equally lacking in evidentiary foundation. It states that a tow-truck must have arrived and towed the Jeep to another destination where Ramos then attached the towbar and Jeep to the Tacoma. Testimony from Savage's investigator detailed that he was informed by a Co-part employee that Ramos affixed the towbar and Jeep while at Co-part. Co-part, however, says there is no proof this occurred and cites to an expert's testimony that affixing the towbar and Jeep to the Tacoma would have required at least forty-five minutes. Additionally, the employee who delivered the Jeep via forklift to Ramos,

7

stated Ramos was gone only minutes afterward. This, combined with lack of eyewitness testimony that Ramos did affix the towbar and Jeep at the Co-part facility, is the basis for Co-part's proposal that Ramos must have been towed out with the Jeep by a tow-truck. Nonetheless, it is undisputed that the Toyota was towing the Jeep via an attached towbar at the time of the accident. Subsequently,

> while driving on I-65 in Louisville, Ramos lost control of the vehicles while changing lanes. James Savage was riding a motorcycle in the same vicinity. There was testimony that another vehicle had lost a load of wooden pallets, requiring other drivers to swerve to avoid them. There was also testimony that Savage struck one of the pallets and was thrown from his motorcycle. Ramos' vehicles side-swiped a tractor-trailer truck, and then ran over Savage, who was lying in the roadway. Savage was killed at the scene.

A comprehensive account of the procedural history, given our more limited review, would only serve to confuse rather than clarify. Pertinently, the claims against Allstate were disposed by summary judgment in 2014, with the trial court concluding Allstate had transferred ownership of the Tacoma according to Maryland law prior to the accident and had no duty thereafter. In 2015, partial summary judgment was granted to Co-part, particularly as to KRS 186A.100 and 186A.520, but the claim based on KRS 189.224 survived. Later that year, the claims against Hartford were disposed by summary judgment with the trial court concluding that Hartford had transferred ownership according to Kentucky law prior to the accident and that Co-part was an independent contractor therefore, any negligence it may have committed could not be attributed to Hartford. Prior to trial, the trial court

8

allowed Co-part to withdraw an admission it had made early in the discovery phase that Ramos "drove out" of its Maryland facility in the Tacoma. The trial court found no prejudice in the withdrawal because a 2014 deposition of a Co-part representative—who stated that the phrase "drove out" did not refer to the Tacoma leaving the facility but rather to the Co-part employee delivering the vehicle to Ramos while still in the facility—had put Savage on notice that the issue was disputed. The court reasoned Savage should have been aware from this deposition that Co-part would contest the admission's meaning, thus, she should have sought more discovery on the issue.

The jury concluded there was no negligence or negligent entrustment in Co-part's conduct, but "determined that Chapa, through its agent Ramos, was solely at fault for the damages. The jury awarded the Estate a total of $75,164.00 in compensatory damages and $5,000,000.00 in punitive damages. The jury also awarded Lauren Savage $500,000.00 for her loss-of-consortium claims." After some post-trial motion practice irrelevant here, the trial court confirmed the jury verdict, and the case was appealed.

### III.   The Court of Appeals' Decision

Judge Maze, writing for a unanimous panel, held as to Co-part's alleged obligation to obtain proof of insurance from Ramos before delivering physical possession of the vehicles, that Co-part had no such obligation. Citing *Gainsco Companies v. Gentry*, 191 S.W.3d 633 (Ky. 2006), the court concluded the "insurance-verification requirement of KRS 186A.220(5)(b) only applies if a dealer wishes to effectively transfer ownership of a vehicle without

9

simultaneously transferring possession of the certificate of title." Because Co-part had transferred title prior to physical delivery of the vehicle, this exception and insurance verification was inapplicable in 2012. As to Hartford's ownership of the Jeep, the court concluded, by the same reasoning, that title had been transferred by Hartford to AUF on March 2, 2012, four days before the physical delivery of the Jeep. Consequently, Hartford had no duty to ensure proof of insurance before delivery to Ramos.

As to the statutory claim against Co-part for violating KRS 186A.100 (requiring temporary registration tags be placed on newly sold vehicles by the motor vehicle dealer), the court held "there is no evidence that AUF is licensed to operate as a motor vehicle dealer anywhere in the United States[,]" thus, "AUF must be considered a consumer and thus a purchaser for use." The trial court had concluded a temporary tag was not mandated by law for salvage-titled vehicles and denied this claim from going to the jury. The Court of Appeals, however, concluded "Co-part is liable for violation of this section only to the extent that the Jeep was required to display a license plate." And because

> Co-part required purchasers to obtain license plates for any vehicles which were intended to be operated on the highways . . . there is at least a factual question whether Co-part reasonably believed the permits were sufficient. Likewise, there is a factual issue whether Co-part was aware or should have been aware that Ramos intended to use the Jeep in a manner requiring the display of a valid license plate.

Consequently, the Court of Appeals ordered a new trial allowing the statutory claim to proceed to the jury.

10

Similarly, the Court of Appeals reversed the trial court's refusal to give an instruction on the claim against Co-part for violating KRS 189.224. That statute prohibits any person that is an employer or otherwise in a position of authority over the operator of a vehicle, "to require or knowingly permit the operation of such vehicle upon a highway in any manner contrary to law." Both the trial court and Court of Appeals focused on the word "operation" and its definition in applying this statute. The Court of Appeals believed Co-part's "duties only require that it not knowingly permit vehicles to be operated in a manner contrary to law[,]" therefore, it remanded for a new trial on this statutory claim as well. In discussing this issue, the Court of Appeals also commented that a relevant question "is whether the Jeep was being 'operated' on the highway in violation of KRS 186A.520 . . . because Co-part's liability is founded upon whether it knowingly permitted Ramos to operate the Jeep on the highways of the Commonwealth."

As an evidentiary matter, the Court of Appeals ruled the trial court abused its discretion when it allowed Co-part to withdraw the admission, discussed above. For that reason, it remanded for a new trial.

Finally, the Court of Appeals discussed the damages calculation because of its remand for a new trial. At trial, Co-part had argued successfully against including Savage's Social Security Disability benefits from being included in the calculation of damages, citing to *Aull v. Houston*, 345 S.W.3d 232 (Ky. App. 2010). *Aull* has been interpreted to prohibit SSD benefits, as they are not earned income therefore cannot be considered in wrongful death claims for

11

purposes of damages, as such damages are measured "by the destruction of the decedent's *power to labor and earn money.*" *Id.* at 235 (quoting *W.L. Harper Co. v. Slusher,* 469 S.W.2d 955, 959 (Ky. 1971)). The appellate court expressed its doubt that *Aull* should be applied in such a broad, categorical manner but concluded that only this Court could abrogate or overrule *Aull* thus, reluctantly affirmed the trial court's decision.

We granted discretionary review principally to consider the application of *Aull* and the novel issue of salvage titled vehicles within the overall framework of determining ownership for liability insurance purposes. Further facts will be developed as necessary. We now address the merits of the appeal.

## IV.    Analysis

### A. Hartford not the Statutory Owner of the Jeep

Savage argues Hartford was the owner of the vehicle, first, because the vehicle remains to this day titled in its name; but secondly, because a bona fide sale did not occur between Hartford and AUF through its agent, Co-part, due to Co-part's failure to strictly comply with KRS 186A.220. Hartford argues it ceased to be the owner of the vehicle on February 18, 2012, when it transferred the necessary title documents and possession of the vehicle to its power of attorney, Co-part. Subsequently, Co-part executed a bona fide sale on March 6, 2012, upon delivery of physical possession of the Jeep to Ramos, with delivery of the title documents having occurred four days earlier on March 2, 2012. Co-part, however, argues that it never had ownership of the Jeep at any time as well as arguing KRS 186A.220 is inapplicable.

12

"Kentucky is a certificate of title state for the purposes of determining ownership of a motor vehicle and requiring liability insurance coverage." *Potts v. Draper*, 864 S.W.2d 896, 898 (Ky. 1993). "The owner of a motor vehicle is the title holder unless a motor vehicle is subject to a valid conditional sale for liability insurance purposes." *Id.* KRS 186A.220(5)

> sets forth an exception to the general rule that the party holding the certificate of title is the owner of the vehicle for insurance purposes. If a dealer wishes to effectively transfer ownership of a vehicle without simultaneously transferring possession of the certificate of title, he must satisfy two requirements: (1) he must obtain the purchaser's consent to file the certificate of title and other documents on behalf of the purchaser, and (2) he must verify that the purchaser has obtained insurance on the vehicle before relinquishing possession.

*Gainsco,* 191 S.W.3d at 636. Hartford did own the Jeep at one time pursuant to KRS 186A.530(3).[4] Savage argues this Court should conclude Hartford is the owner of the jeep by virtue of KRS 186A.530(3), KRS 189.228,[5] and KRS 186A.215(4).[6] That argument fails for the simple fact that neither KRS

---

[4] That provision states: "If ownership of a motor vehicle has been transferred to an insurance company through payment of damages, the insurance company making the payment of damages shall be deemed the owner of the vehicle."

[5] That provision states: "For the purposes of KRS 189.221 to 189.228, proof of the registration of any vehicle in the name of any person shall be prima facie evidence of ownership of said vehicle by the person in whose name it is registered, and each violation by an owner, whether or not with the same vehicle, shall constitute a separate offense by that owner."

[6] That provision states: "If it comes to the attention of a transferor that a transferee did not promptly submit the necessary document within fifteen (15) calendar days to the county clerk as required by law in order to complete the transfer transaction, a transferor shall submit to the county clerk, in his county of residence, an affidavit that he has transferred his interest in a specific vehicle, and the clerk shall enter appropriate data into the AVIS system which shall restrict any registration transaction from occurring on that vehicle until the transfer has been processed. The Transportation Cabinet may adopt administrative regulations governing this subsection. This subsection shall not apply to any transactions involving licensed Kentucky motor vehicle dealers."

13

186A.530(3) nor KRS 189.228 mandate that the title holders shall be deemed owners for liability insurance purposes in all circumstances. Ownership is determined either by the legal title holder or pursuant to a bona fide sale. KRS 186A.510(6). KRS 186A.215(4) obviously does not apply because this is a transaction involving Co-part, a licensed Kentucky motor vehicle dealer. Thus, we must determine whether Co-part's sale to AUF was bona fide under the appropriate statute. If so, then Hartford cannot be deemed the owner.

Savage contends that Co-part was required to obtain proof of insurance in all sales transactions by virtue of *Gainsco,* and failure to do so negates any conclusion that the sale was bona fide. The Court of Appeals concluded, per *Gainsco,* that insurance verification was not required because Co-part had transferred the certificate of title four days prior to Ramos obtaining possession of the Jeep. The Court of Appeals correctly understood our holding in *Gainsco.* That case did not hold proof of insurance was required in all motor vehicle sales, but only "[i]f a dealer wishes to effectively transfer ownership of a vehicle without simultaneously transferring possession of the certificate of title. . . ." *Gainsco,* 191 S.W.3d at 636. We therefore affirm the Court of Appeals' conclusion that because Co-part transferred possession of the certificate of title to Ramon Martar Bubio on March 2, 2012, Co-part had no legal mandate to obtain proof of insurance from Ramos. Although possession of the vehicle was not simultaneous with delivery of the certificate of title, it is the latter which gave Ramos, as AUF's agent, the right to take possession of the Jeep.

Savage argues this Court should look to the 2016 amendment to KRS 186A.220, which reads "When a dealer assigns a vehicle to a purchaser for use under paragraph (a) of this subsection, the transfer and delivery of the vehicle is effective immediately upon the delivery of all necessary legal documents, or copies thereof, including proof of insurance as mandated by KRS 304.39-080." KRS 186A.220(5)(d). Savage believes this provision codified *Gainsco.* As we have just stated, however, Savage has fundamentally misconstrued the *Gainsco* holding. There is no basis to argue it held proof of insurance was required in all motor vehicle transactions whatsoever, and KRS 186A.220(5)(d), as it currently stands, is not a codification of its holding.[7] *Gainsco* instead dealt with the statutory exception when certificates of title were not simultaneously transferred along with possession of the vehicle; that exception now codified as KRS 186A.220(5)(b). 191 S.W.3d at 636.

## B. Co-part's Duties under KRS 186A.100 and KRS 189.224

It is clear that Co-part was never an owner of the Jeep. Although Hartford made that argument, the Court of Appeals correctly noted the fallacy of Hartford's reasoning:

> the record reflects only that Co-part executed the dealer assignment on the certificate of title. Co-part was authorized to execute the title based on the limited power of attorney which Hartford had granted it. The power of attorney would not have been necessary if Hartford had transferred to [sic] title to Co-part.

---

[7] To the contrary, because of the 2016 amendment, KRS 186A.220(5) with all its subparts now does require proof of insurance to be shown in all transactions whatsoever. Thus, KRS 186A.200(5)(d) is actually the legislature statutorily overruling *Gainsco.* Because we are dealing with a case that occurred in 2012, the case remains applicable here. But bench and bar should mark this issue prospectively.

15

Nevertheless, the Court of Appeals did conclude the trial court erroneously granted summary judgment to Co-part as to KRS 186A.100 and improperly failed to instruct the jury as to statutory duties Co-part had as a dealer under KRS 189.224.[8] We review the former under the summary judgment *de novo* standard. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). An alleged error in failing to give a warranted jury instruction is reviewed for an abuse of discretion. *Kentucky Guardianship Administrators, LLC v. Baptist Healthcare Sys., Inc.*, 635 S.W.3d 14, 35 (Ky. 2021). As to reversing the summary judgment under KRS 186A.100, the Court of Appeals held,

> Co-part is liable for violation of this section only to the extent that the Jeep was required to display a license plate. The trial court took the position that, since a license plate is not issued for a vehicle with a salvage title, such a vehicle need not display a plate as long as it is in tow. Furthermore, Co-part required purchasers to obtain license plates for any vehicles which were intended to be operated on the highways. Although the three-day permits obtained by Ramos did not authorize him to operate the vehicles on the highway outside of Arizona, there is at least a factual question whether Co-part reasonably believed the permits were sufficient. Likewise, there is a factual issue whether Co-part was aware or should have been aware that Ramos intended to use the Jeep in a manner requiring the display of a valid license plate. For these reasons, we conclude that the Estate was entitled to submit this statutory claim to the jury.

KRS 186A.100(1) states,

> A motor vehicle dealer licensed under KRS 186.070 who sells a vehicle for use upon the highways of this state shall equip the vehicle with a temporary tag executed in the manner prescribed

---

[8] Co-part argues this ruling was a summary judgment. The Court of Appeals noted, however, the trial court initially declined to grant summary judgment on this issue and only at the conclusion of trial did it decline to give a jury instruction. Our review will proceed under the abuse of discretion standard, but our substantive ruling would also justify reversal *de novo* as well.

below, which shall be valid for sixty (60) days from the date the vehicle is delivered to the purchaser.

The Court of Appeals was under the impression that because there is no evidence AUF is an authorized motor vehicle dealer anywhere in the United States, that its purchase of the Jeep was as a consumer, therefore "for use" under our decision in *Travelers Indemnity Co. v. Armstrong*, 565 S.W.3d 550, 562-63 (Ky. 2018). *Travelers*, however, did not deal with a salvage titled vehicle.[9] The Court of Appeals' reliance upon *Travelers* puts the cart before the horse. As it correctly noted, Co-part could only be liable for a violation of KRS 186A.100 to the extent the jeep required a temporary tag under that statute. Therefore, there is a necessary precondition to be satisfied before the question of whether the Jeep was sold to a purchaser for use. The trial court correctly understood this and determined that because a salvage titled vehicle cannot be issued a license plate (a tag), KRS 186A.100 simply cannot apply. We agree with the trial court's conclusion.

"Salvage titles shall be construed as proof of ownership of a vehicle in a state as to be unusable upon the highways of the Commonwealth. A vehicle shall not be issued a registration for highway use as long as a salvage title is in force." KRS 186A.520(5). If KRS 186A.520(5) prohibits the issuance of a registration for highway use, then KRS 186A.100 cannot apply since it only

---

[9] *Travelers* is applicable here only to the extent that this Court rejected the broad and expansive definition offered by the Appellee in that case, that "purchaser for use" could mean "for inventory, floor model, demo driver, for parts, or use in multiple ways to make a profit." *Id.* at 563. We stated such an interpretation renders the purchaser for use language superfluous. *Id.*

applies when "A motor vehicle dealer licensed under KRS 186.070 . . . sells a vehicle for use upon the highways . . . ." And a motor vehicle dealer cannot sell a salvage titled vehicle for use upon the highways since the General Assembly has declared all such vehicles are "unusable upon the highways of the Commonwealth." Therefore, we conclude the Court of Appeals erred in reversing the trial court and we reinstate the trial court's summary judgment.

As to the refusal to give a jury instruction under KRS 189.224, the Court of Appeals concluded,

> Co-part's liability is founded upon whether it knowingly permitted Ramos to operate the Jeep on the highways of the Commonwealth. The trial court concluded that the plain meaning of the term "operated" requires "more affirmative action than just connecting it by means of a tow bar to another vehicle."

> We disagree with the trial court's reasoning. The Toyota and the towed Jeep constituted a single unit, and both were being "operated" for purposes of KRS 189.224 and 186A.520(6).

"It is unlawful for the owner, or any other person, employing or otherwise directing the operator of any vehicle, to require or knowingly to permit the operation of such vehicle upon a highway in any manner contrary to law." KRS 189.224. As before, the Court of Appeals has overlooked a necessary precondition to the application of this statute to Co-part—that is whether Co-part was "any other person, employing or otherwise directing" Ramos when he operated the Jeep. It is obvious that Co-part was not Ramos' employer. But was it "otherwise directing" Ramos? That phrase comes after the word "employing" and clues us to what the General Assembly meant by the word directing. Its root is direct, "to regulate the activities or course of" or "to request

18

or instruct with authority." *Direct, Webster's New Dictionary of the English Language* 147 (2001). Thus, we conclude "any other person. . . otherwise directing. . . ." means a person in a position of authority over the operator of the vehicle in a such a manner that the operator is under the coercive power of the person otherwise directing him. If the operator of the vehicle is not subject to the coercive power of the person otherwise directing, then how could one reasonably expect the latter to be able to prevent the former from operating the vehicle in a manner contrary to law?

In this case, Co-part was not a person otherwise directing Ramos because it was not in a position of authority over him nor was Ramos subject to Co-part's coercive power. Ramos was an agent for a purchaser who already possessed the certificate of title. He presented the two transaction numbers demonstrating his agency for AUF, and Co-part was not in a position to challenge it. Once Co-part delivered possession of the vehicle to Ramos, it was his vehicle to operate at his pleasure subject to the normal laws applicable to everyone. Therefore, we conclude the trial court properly declined to give an instruction and reverse the Court of Appeals.

## C. Improper Fact Finding by the Court of Appeals

Our conclusion regarding the statutory duties of Co-part as a matter of statutory interpretation is not the end of the inquiry. Co-part, in its own appeal, has alleged the Court of Appeals improperly engaged in fact finding when it stated, substantively, that Ramos had affixed Arizona tags as well as attached the towbar to the Toyota Tacoma and then attached the Jeep to the

towbar at the Co-part facility. We detailed this factual issue *supra*, pages 7-8. It is obvious this fact pattern influenced the Court of Appeals in its rulings regarding KRS 186A.100 and 189.224, as the court made specific references to such facts, as quoted above in Section IV B, when reversing the trial court. If, however, these "facts" are no facts at all, then the lower court has erred and engaged in improper fact finding.

Co-part is correct that admissions of one co-defendant cannot be used against another "unless they consent thereto, adopt the statements as their own, or there is 'privity' between the party making the admission and the coparties." *Newark Ins. Co. v. Bennett*, 355 S.W.2d 303, 304 (Ky. 1962). The trial court ruled there was no privity between Co-part and Chapa, thus Chapa's admissions could not be used as evidence against Co-part. The Court of Appeals' use of Chapa's admissions to reverse the trial court below regarding Co-part's alleged statutory duties, without at all discussing the legal merits of party admissions and privity, was error. If the Court of Appeals believed the trial court had erred in disallowing the party admissions of Chapa to be used against Co-part, then it was incumbent upon the appellate court to demonstrate how that evidentiary ruling was an abuse of discretion. *Kentucky Guardianship*, 635 S.W.3d at 21. Absent abuse, the evidentiary rulings of the trial court are binding upon appellate courts. Because the Court of Appeals failed to even attempt to demonstrate an abuse of discretion occurred, it was the one that in fact acted arbitrarily. Thus, its rulings regarding KRS 186A.100

and 189.224 are reversible even if the Court of Appeals had correctly interpreted their statutory language.

Apart from the Chapa admissions, only the hearsay testimony of Savage's investigator, that an employee of Co-part told him Ramos attached the Jeep there, was offered against Co-part to prove Ramos had in fact attached the Jeep to the Toyota while at the Co-part facility. We will not reverse the trial court upon such a precarious evidentiary foundation, especially in light of the absence of any physical evidence or eyewitness testimony that Ramos had attached the Jeep at Co-part, which an expert testified would require 30-45 minutes and an acetylene torch to complete. There was no factual basis, *admissible against Co-part*, to find a genuine issue of material fact existed and reverse the summary judgment regarding KRS 186A.100. Even assuming *arguendo* Co-part had a duty under KRS 189.224, there was no factual basis, *admissible against Co-part*, that it may have violated that duty thereby warranting a jury instruction.

### D. Court of Appeals Erred in Reversing Trial Court on Withdrawal of Admission

At some time during discovery Savage sent Co-part its request for admissions, one of which read, "Please admit Co-part's records show Oscar Ramos drove the Toyota away from its Baltimore, Maryland facility." Co-part admitted the request due to a "drove out" notation existing on its records. But, in April 2014, Aron Rosenfield, the Co-part corporate representative, testified at deposition that "drove out" referred to the removal of the Toyota out of the

21

secure storage and into the bullpen for delivery to Ramos. Upon this basis, the trial court allowed Co-part to withdraw the admission on December 1, 2015. Before the Court of Appeals, Savage argued she "was prejudiced by the untimely withdrawal of the admission because it was unable to conduct additional discovery on the matter prior to trial."

The Court of Appeals agreed with Savage. Because it had determined the trial court should have allowed the jury to consider Savage's statutory claim under KRS 189.224, it considered Co-part's conduct in Maryland relevant to its knowledge of Ramos' conduct in driving the vehicles in Kentucky. Nonetheless, the appellate court noted its agreement "with the trial court that Co-part's conduct in Maryland is not actionable in this case." Moreover, the appellate court ruled "[b]y waiting until the discovery deadline had passed to make this motion, Co-part severely limited the Estate's options to conduct additional discovery on the issue. At the very least, the trial court failed to address the prejudice caused by Co-part's failure to seek an earlier withdrawal of the admission." Because we have already determined the Court of Appeals erred in reversing regarding KRS 189.224, this issue is now largely moot. We briefly address it to clarify the record and demonstrate that Savage was not prejudiced by the withdrawal.

The withdrawal of an admission is an evidentiary ruling subject to review under an abuse of discretion. *Kentucky Guardianship*, 635 S.W.3d at 21. "Any matter admitted under Rule 36 is conclusively established unless the court on motion permits withdrawal or amendment of the admission[,]" and "the court

22

may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits." CR 36.02. Requests for admission are to be used to "seek the truth of vital controversial issues of fact . . . ." *McGiboney v. Brd. of Ed. Middlesboro*, 387 S.W.2d 869, 872 (Ky. 1965). "The intendment of that rule is that parties to litigation should not consume time at trial, or be put to expense in making proof of evidentiary, or ultimate facts appearing in a case that are not substantially contested." *Berrier v. Bizer*, 57 S.W.3d 271, 279-80 (Ky. 2001) (quoting *Jones v. Boyd Truck Line*, 11 F.R.D. 67, 69 (W.D. Mo. 1951)).

The record demonstrates that Co-part did not move for withdrawal of the admission, on November 16, 2015, until after Savage filed a motion in limine on October 27, 2015, seeking to prohibit the deposition testimony of Rosenfield contrary to the admission. Thus, we cannot agree with the Court of Appeals that Co-part deliberately waited until after discovery deadlines to move for withdrawal of the admission in an attempt to prejudice Savage. Savage's motion practice brought it about. Additionally, the Court of Appeals believed that because Co-part's motion came after the discovery deadlines had passed, "Co-part severely limited the Estate's options to conduct additional discovery on the issue." Once again, the record does not support this conclusion. What the record does show is that on December 21, 2015, the trial court, because a new judge had been appointed, issued a new scheduling order and re-opened

23

discovery. The December 21st order set trial for May 24, 2016, and set new deadlines for the identification of expert witnesses and lay witnesses, the identification of exhibits, and the time for taking depositions. Savage's own conduct after that order was issued confirms this understanding. She filed a motion to amend her complaint, supplemented her interrogatory answers and responses to requests for production of documents, proposed a new expert witness, sent subpoena duces tecum to several persons requesting documents, as well as filing motions asking the trial court to revisit rulings, such as *Daubert* determinations regarding several experts. Savage has correctly noted that Co-part argued for the trial court to dispense with the new trial deadlines and effectively cut off any new discovery. But that only demonstrates that Co-part in fact believed discovery had been reopened.

Finally, and dispositively, the trial court ruled on February 25, 2016, to dispense with the new deadlines. In so doing, the trial court also ruled the expert named and the subpoenas issued prior to that ruling would be allowed because Savage had relied in good faith on the deadlines issued by the trial court. Moreover, the trial court ruled it would entertain a motion to exclude Savage's new expert but not on grounds of timeliness. Thus, the trial court treated the case as if discovery had been effectively open for at least two months. In that time, Savage had sought to take advantage of the new window of discovery on numerous other issues and witnesses, demonstrating she was well aware she could have issued subpoenas to Co-part's Maryland facility employees. Accordingly, there was no prejudice suffered by Savage due to the

withdrawal of the admission, and the deposition testimony of Co-part's representative demonstrated that, if Maryland conduct would be considered at trial, then Co-part would be disputing whether Ramos drove out of the Maryland facility.

### E. Strict Liability for Co-part under KRS Chapter 186A.500

This next issue comes as a denial of a motion for directed verdict by Savage.

> The standard of review of a trial court's denial of a motion for directed verdict is explained in detail in *Lewis v. Bledsoe Surface Mining Co.,* 798 S.W.2d 459 (Ky. 1990):
>
> > Upon review of the evidence supporting a judgment entered upon a jury verdict, the role of an appellate court is limited to determining whether the trial court erred in failing to grant the motion for directed verdict. All evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence, these being functions reserved to the trier of fact.
>
> *Id.* at 461 (citing *Kentucky & Indiana Terminal R. Co. v. Cantrell,* 298 Ky. 743, 184 S.W.2d 111 (1944); *Cochran v. Downing,* 247 S.W.2d 228 (Ky. 1952)).

*Demetre,* 527 S.W.3d at 25. Unless the verdict rendered by the jury was "palpably and flagrantly" against the evidence, the denial of a motion for directed verdict will stand. *Id.* Savage's argument, however, does not even attempt to argue the jury's verdict was palpably or flagrantly against the evidence. Instead, in just under two pages of argument and citing only one legal source, Prof. Prosser's Handbook of the Law of Torts, she asks this Court

to impose strict liability for violations of all provisions of KRS Chapter 186A.500 as a matter of law.

We decline to hold strict liability applies as a matter of law for violations of KRS Chapter 186A.500. Salvage titled vehicles are declared unusable upon the highways of the Commonwealth and are considered so for the reason that they have been damaged to such an extent that the cost of repair "exceeds seventy-five percent (75%) of the retail value of the vehicle. . . ." KRS 186A.520(1)(a). This condition makes them an unavoidably unsafe product. The General Assembly's legislation regarding salvage titled vehicles is an effort to regulate that market, not snuff it out existence. As such, in line with our adoption of Restatement (Second) of Torts § 402A, *Worldwide Equipment, Inc. v. Mullins*, 11 S.W.3d 50, 55 (Ky. 1999), the comments to the Restatement are illustrative. In Comment K, the commentary explains that unavoidably unsafe products are those that "in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use."[10] Because of this,

> The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

---

[10] Obviously, as a general matter, salvage vehicles are capable of being repaired. But if the General Assembly desired that only repaired salvage vehicles be marketed in Kentucky it could have used the language necessary to regulate the market accordingly.

We have applied this reasoning before in the case of dynamite, arguably a more dangerous product than a salvage titled vehicle. *Hercules Powder Co. v. Hicks*, 453 S.W.2d 583 (Ky. 1970). Moreover, the difference between negligence and strict liability is the shift "from the conduct of the actor, which is the problem in negligence cases, to the condition of the product." *Montgomery Elevator Co. v. McCullough by McCullough*, 676 S.W.2d 776, 780 (Ky. 1984). But Savage's claim for strict liability against Co-part necessarily focuses on its *conduct* in allegedly failing to comply with statutes, not with the condition of the Jeep. Therefore, Savage has not in fact brought a strict liability claim at all. And given her failure to offer any argument as to the jury's verdict on this issue being palpably and flagrantly against the evidence, we conclude it was not. Thus, the motion to deny the directed verdict stands.

### F. *Aull v. Houston* is Abrogated

Finally, the question of *Aull v. Houston*, 345 S.W.3d 232 (Ky. App. 2010) troubled the Court of Appeals greatly. It explained,

> We question whether *Aull* should be broadly read to exclude receipt of SSD benefits from economic losses in all wrongful death actions. *Aull* involved the alleged wrongful death of a child who received immunizations at the age of five which purportedly caused his death. Notably, the child had earlier been diagnosed with a profoundly disabling condition with a poor prognosis. The trial court granted a partial summary judgment ruling that damages could not be recovered for the destruction of power to earn money because the evidence was undisputed that the child was incapable of ever earning money from his own labor. *Id.* at 234. This Court affirmed, holding, "the inference that the child, someday, would have the ability to 'earn' money is simply, and sadly, unreasonable. It was not error for the trial court to conclude that the child was unable to earn money" by his own labor. *Id.*

Unlike in *Aull*, Savage's receipt of SSD benefits was not merely speculative. His benefits were based upon his actual work history and loss of earning capacity. Furthermore, while Savage was totally disabled from his prior employment, he was not entirely disabled as was the child in *Aull*. Indeed, the Estate points to evidence that Savage was able to do extensive work around the house, which would be indicative of at least some earning capacity. Finally, in other contexts, SSD benefits replace income which is lost before retirement and are treated in the same manner as income. *See Holman v. Holman*, 84 S.W.3d 903, 910 (Ky. 2002) (treating disability benefits as a replacement for lost future income and thus not divisible as marital property). For these reasons, we believe that the holding of *Aull* should be limited to the factual circumstances presented in that case.

*Aull* held "the measure of damages in a wrongful death action in this state is the damage to the estate by the destruction of the decedent's *power to labor and earn money*." *Id.* at 235 (quoting *W.L. Harper Co. v. Slusher*, 469 S.W.2d 955, 959 (Ky.1971)). We consider *de novo* whether the Court of Appeals, through *Aull*, has faithfully applied the wrongful death statute.

In Kentucky, "Whenever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it." KRS 411.130(1). "Ours is one of the so-called 'true' wrongful death statutes which have been construed to measure damages by loss to the decedent's estate . . . ." *Empire Metal Corp. v. Wohlwender*, 445 S.W.2d 685, 687 (Ky. 1969). Whilst we continue to adhere to the rule expressed in *Slusher*, that the measure of damages to an estate is calculated according to the "destruction of the decedent's power to labor and earn money," we have recognized that substitutes for the laboring and earning of money may be considered in damages calculations. *Heskamp v. Bradshaw's Adm'r*, 172

28

S.W.2d 447, 451 (Ky. 1943) (holding decedent's employee pension was a substitute for earning power). Thus, the question is do social security disability benefits operate as a substitute for earned income? We hold they do and may be presented to the jury as evidence for calculating damages.

In *Aull*, the decedent was a five-year-old child, who shortly after birth had been diagnosed with Leigh's Disease, a disease that presents with "a seizure disorder, significant muscular hypotonia, regression of his development status and decreased visual responsiveness." *Aull*, 345 S.W.3d at 233. Leigh's Disease in infants typically results in an early death, as occurred in *Aull*. The parents brought a wrongful death action, and on appeal challenged the trial court's summary judgment eliminating their claim for the destruction of their child's future earning capacity. *Id.* at 234. The parents admitted their child's "disability was so profound as to render him incapable of ever earning money by his labor." *Id.* The only contention was whether "an entitlement received because of one's disability is the equivalent of income earned as a result of one's labor." *Id.* at 235. The Court of Appeals concluded since the child "experienced no destruction of his power to labor at the hands of the Appellees, Appellants cannot recover damages for the destruction of his power to labor and earn money under KRS 411.130." *Id.* at 237. That conclusion, however, was supported by only two cases which we find readily distinguishable from the social security disability benefits earned by the decedent in this case.

To answer the question whether governmental benefits are equivalent to earned income, the *Aull* court relied principally upon *Birkenshaw v. Union*

29

*Light, Heat and Power Co.,* 889 S.W.2d 804 (Ky. 1994) and *Green River Elec. Corp. v. Nantz,* 894 S.W.2d 643, 646 (Ky. App. 1995), to hold receipt of government benefits were not akin to earning income. Both cases dealt with worker's compensation benefits received exclusively by the decedent's widow. *Birkenshaw* held a widow's receipt of her husband's worker's compensation benefits as a result of his death while engaged in employment, "are not payable in any event to the estate of the decedent [thus], they cannot be considered an element of damages payable to the estate . . . ." 889 S.W.2d at 806. In *Nantz,* the decedent died while a worker's compensation claim was pending. His widow settled that claim barely two months after filing the wrongful death action. 894 S.W.2d at 643. The widow successfully prevented evidence of the settlement from being presented to the jury over Green River's objection. The Court of Appeals first noted that evidence of settlements is generally inadmissible. *Id.* at 645. Then, considering whether the settlement was even relevant to wrongful death damages, the court answered negatively. *Id.* at 646. It explained,

> "The disability figure contained in a settlement agreement is a negotiated figure and may or may not equal the claimant's actual occupational disability." *Newberg v. Davis,* Ky., 841 S.W. 2d 164, 166 (1992). We agree with the trial court that the effects of the decedent's injury, not the percentage of occupational disability agreed to for settlement purposes, is relevant to the decedent's power to earn money. *See Davis, supra; Faultless Hardware,* [837 S.W.2d 893, 896 (Ky. 1992)]. Therefore, in accordance with KRE 408, the permanent partial disability figure agreed to in the parties' settlement agreement was not relevant evidence in the case at bar, and consequently was inadmissible.

*Id.* In other words, the settlement was irrelevant to the damages calculation because it might not be equal to the decedent-claimant's actual measure of

occupational disability at the time of his death, therefore would not be a proper reflection of his loss of earning power.

As the Court of Appeals noted in this case, "At the time of his death, Savage was suffering from degenerative disk disease and osteoarthritis. He was unable to work outside the home, and he had been receiving SSD benefits since 2008." That court also noted, "Savage's receipt of SSD benefits was not merely speculative. His benefits were based upon his actual work history and loss of earning capacity." These benefits were not worker's compensation payments negotiated by the dependent widow, as in *Nantz*, nor were they compensation payments to the widow as a result of a decedent-claimant's death, as in *Birkenshaw*. We therefore find those cases inapposite to the issue here.

It is also necessary to explain the difference between Savage's SSD benefits and the benefits received by the decedent in *Aull*. As a child with a profound disability, the decedent in *Aull* obviously never paid into the social security system. Thus, he could not have been receiving the same social security benefits that Savage was receiving. He must have been receiving Social Security Insurance benefits. As a federal circuit court has explained,

> The most familiar social security program is federal old age, survivors and disability insurance, the core provisions of which were adopted as part of the New Deal in 1935. 42 U.S.C. §§ 401–433. It is based on contributions made by employees and their employers to the social security trust fund, and it primarily provides retirement income. But if an insured worker becomes disabled before retirement, scheduled benefits are payable to the employee during disability. *Id.* §§ 401(b), 423. The latter payments are called "social security disability" or "SSD."

In 1972, Congress added a new social security program to provide "supplemental security income" (called "SSI") for "aged, blind and disabled" persons of limited means regardless of their insured status. 42 U.S.C. §§ 1381a, 1382. This is a social welfare program funded out of general taxpayer revenues.

*Splude v. Apfel*, 165 F.3d 85, 87 (1st Cir. 1999). A California appellate court is also helpful in understanding the difference.

1. SSDI—The Social Security Administration pays these benefits to workers who have earned enough credits but can no longer work due to a disability. (42 U.S.C. § 423, subd. (a); 2 Soc. Sec. Law & Prac. (Feb. 2020) § 14:22.) Because it is an earned benefit based on the disabled person's contributions to Social Security, the monthly payment can be substantial if the disabled person was previously a high wage earner.

   …

2. Supplemental Security Income (SSI) – "The basic purpose underlying the SSI program is to assure a minimum level of income for people who are age 65 or over, or who are blind or disabled and who do not have sufficient income and resources to maintain a standard of living at the established federal minimum income level." (20 C.F.R. § 416.110.) In addition to age, blindness, or having a disability, SSI eligibility requires (1) a certain residency or United States citizenship status, (2) evidence the person is not a "fugitive fleeing" or in violation of a probation condition or parole, (3) "income within specified limits," and (4) "resources within specified limits." (2 Soc. Sec. Law & Prac. (Feb. 2020) § 18:2.)

*Lak v. Lak*, 50 Cal. App. 5th 581, 594-95 (Cal. App. 2020). Finally, we would be remiss in failing to note that even the Supreme Court of the United States recognizes "the interest of an individual in continued receipt of these [Social Security disability] benefits . . . [are] a statutorily created 'property' interest protected by the Fifth Amendment." *Matthew v. Eldridge*, 424 U.S. 319, 332 (1976). This is because "[t]he 'right' to Social Security benefits is in one sense 'earned,' for the entire scheme rests on the legislative judgment that those who

32

in their productive years were functioning members of the economy may justly call upon that economy, in their later years, for protection . . . ." *Flemming v. Nestor*, 363 U.S. 603, 610 (1960). Thus, there is an interest "of sufficient substance to fall within the protection from arbitrary governmental action afforded by the Due Process Clause." *Id.* at 611.

Therefore, we abrogate *Aull* to the extent it can be read to hold that SSD benefits, which are based on a decedent's contribution into the social security system during his productive years, are not a substitute for earned income and thereby inadmissible in a damages calculation in a wrongful death suit. We hold SSD benefits do in fact operate as a substitute for earned income either in the case of retirement or in disability and therefore are properly admissible in a wrongful death action. To the extent *Aull* stands for the proposition that SSI benefits received by a decedent-child, who from infancy was plagued with a profound disability or disease and never had the capacity to labor or earn income, may not be considered in damages calculations in a wrongful death suit, it remains good law. Consequently, we remand back to the trial court for a partial retrial on damages pursuant to *Nolan v. Spears*, 432 S.W.2d 425, 428 (Ky. 1968).

## V.     Conclusion

For the aforementioned reasons, we affirm in part and reverse in part the Court of Appeals. We remand back to the trial court for a new, partial retrial on damages so that the SSD benefits of Savage may be considered.

33

All sitting. VanMeter, C.J.; Bisig, Keller, Lambert, Nickell, JJ., concur.

Thompson, J., concurs in result only.

COUNSEL FOR APPELLANT:

Richard M. Breen
G. Adam Redden
Connor M. Breen
Richard Breen Law Offices, P.S.C.

COUNSEL FOR APPELLEES, COPART OF CONNECTICUT, INC., TOM TAYLOR, DANNY BOND, WILLIS JOHNSON, WILLIAM FRANKLIN, and PAUL STYLER:

Michael E. Hammond
J. Lacey Fiorella
Landrum & Shouse, LLP

COUNSEL FOR APPELLEE, PROPERTY & CASUALTY INSURANCE COMPANY OF HARTFORD:

R. Craig Reinhardt
Neal J. Manor
Reinhardt & Associates, PLC

COUNSEL FOR APPELLEE, ALLSTATE INSURANCE COMPANY:

Robert E. Stopher
Robert D. Bobrow
Boehl Stopher & Graves, LLP

COUNSEL FOR APPELLEE, OSCAR RAMOS:

Edward H. Benjamin
Parrent & Oyler

COUNSEL FOR APPELLEE, LIBERTY MUTUAL FIRE INSURANCE COMPANY:

Charles H. Cassis
Anthony R. Johnson
Goldberg Simpson, LLC

APPELLEES: Margarita Chapa; Chapa, Inc.; Felix Ventura Barraza; and Autos Usados Felix
Pro Se

COUNSEL FOR AMICI, KENTUCKY DEFENSE COUNSEL:

Valerie W. Herbert
Travis Herbert & Stempien

COUNSEL FOR AMICI, KENTUCKY JUSTICE ASSOCIATION:

Jeffrey A. Roberts
Jeffrey Roberts Law